# EXHIBIT 2

**EXECUTION COPY**

ASSET PURCHASE AGREEMENT

by and between

WEAR ME APPAREL CORP.

and

HEYMAN CORPORATION,

Dated as of April 7, 2006

KL2:2428368.11

## TABLE OF CONTENTS

Page

ARTICLE I      Certain Definitions ................................................................... 1

ARTICLE II     Purchase and Sale ................................................................. 9
    2.1        Purchase and Sale of Assets ........................................... 9
    2.2        Assumption of Liabilities .................................................. 9
    2.3        Purchase Price .................................................................. 10
    2.4        Allocation of Purchase Price .......................................... 11
    2.5        Absence of Consents. ..................................................... 11
    2.6        Property Held by Others .................................................. 12
    2.7        2007 Note ......................................................................... 12

ARTICLE III    Closing ................................................................................ 13
    3.1        Closing Date ..................................................................... 13
    3.2        Certain Actions at Closing .............................................. 13

ARTICLE IV     Representations and Warranties of Seller ..................... 15
    4.1        Organization and Good Standing ................................... 15
    4.2        Authorization .................................................................... 15
    4.3        No Conflicts; Consents .................................................... 16
    4.4        Financial Statements; Undisclosed Liabilities; Promotions and
               Allowances; Inventory ...................................................... 16
    4.5        Taxes. ................................................................................ 17
    4.6        Real and Personal Property ............................................ 18
    4.7        Intellectual Property. ....................................................... 19
    4.8        Certain Contracts and Agreements. .............................. 20
    4.9        Insurance. ......................................................................... 23
    4.10       Litigation. ......................................................................... 23
    4.11       Condition and Sufficiency of Assets ............................. 23
    4.12       Compliance with Law; Permits; Customs. ................... 23
    4.13       Employees. ...................................................................... 25
    4.14       Employee Benefit Plans .................................................. 27
    4.15       Environmental Matters. ................................................... 29
    4.16       Bank Accounts and Powers of Attorney ...................... 30
    4.17       Absence of Certain Changes ......................................... 30
    4.18       Books and Records ......................................................... 32
    4.19       Transactions with Affiliates ........................................... 32
    4.20       Customer Relationships .................................................. 32
    4.21       Absence of Certain Business Practices ........................ 33
    4.22       Brokers and Finders ........................................................ 33
    4.23       Restrictions on Business Activities .............................. 33

| 4.24 | Payables | 33 |
| 4.25 | Receivables | 33 |
| 4.26 | Business Relations | 33 |
| 4.27 | Solvency | 34 |
| 4.28 | Disclaimer of Other Representations and Warranties | 34 |

ARTICLE V    Representations and Warranties of the Purchaser ...........34
| 5.1 | Organization and Good Standing | 34 |
| 5.2 | Authorization | 34 |
| 5.3 | No Conflicts; Consents | 34 |
| 5.4 | Litigation | 35 |
| 5.5 | Brokers and Finders | 35 |
| 5.6 | Disclaimer of Other Representations and Warranties | 35 |

ARTICLE VI    Certain Covenants...........35
| 6.1 | Public Announcement | 35 |
| 6.2 | Performance of Excluded Liabilities | 35 |
| 6.3 | Conveyance Taxes, etc | 35 |
| 6.4 | Receipt of Property Relating to Purchased Assets | 36 |
| 6.5 | Liability Insurance | 36 |
| 6.6 | Delivery of Books and Records | 36 |
| 6.7 | Employee Matters | 36 |
| 6.8 | Certain Post-Closing Obligations. | 36 |
| 6.9 | Non-competition. | 37 |
| 6.10 | Contingent Payment Target | 39 |
| 6.11 | Confidential Information | 39 |

ARTICLE VII    Indemnification...........39
| 7.1 | Survival of Representations, Warranties and Covenants | 39 |
| 7.2 | Indemnification by the Seller. | 40 |
| 7.3 | Indemnification by the Purchaser. | 41 |
| 7.4 | Assumption of Defense | 42 |
| 7.5 | Non-Assumption of Defense | 42 |
| 7.6 | Indemnified Party's Cooperation as to Proceedings | 43 |
| 7.7 | Payments Treated as Purchase Price Adjustment | 43 |
| 7.8 | Limitations on Indemnity | 43 |

ARTICLE VIII    Miscellaneous...........43
| 8.1 | Expenses | 43 |
| 8.2 | Entirety of Agreement | 43 |
| 8.3 | Notices | 44 |
| 8.4 | Amendment | 44 |
| 8.5 | Waiver | 44 |
| 8.6 | Counterparts; Facsimile | 44 |
| 8.7 | Assignment; Binding Nature; No Beneficiaries | 44 |
| 8.8 | Headings | 45 |
| 8.9 | Governing Law; Jurisdiction | 45 |

KL2:2428368.11

8.10    Construction; Disclosure Schedules. ................................................................45
8.11    Negotiated Agreement.........................................................................................45
8.12    Remedies Cumulative..........................................................................................46
8.13    Severability.........................................................................................................46
8.14    Right of Set-Off...................................................................................................46
8.15    Arbitration. .........................................................................................................47
8.16    No Joint Venture..................................................................................................48
8.17    WAIVER OF JURY TRIAL .................................................................................48
8.18    Bulk Transfer Laws .............................................................................................48

KL2:2428368.11

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of April 7, 2006, is by and between Wear Me Apparel Corp., a New York corporation (the "Purchaser"), and Heyman Corporation, a Delaware corporation (the "Seller").

### RECITALS

WHEREAS, Seller is engaged in the business of selling licensed branded and private label infant and toddler apparel and accessories, with a specific focus on the newborn to twenty-four month category, to mass merchandisers, department stores and other retailers located throughout the United States (the "Business");

WHEREAS, the Purchaser desires to acquire from Seller, and Seller desires to sell, transfer and assign to Purchaser, all of the assets of and relating to the Business (other than Excluded Assets, as hereinafter defined).

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE I

### Certain Definitions

"AAA" has the meaning set forth in Section 10.15.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Person. For purposes of this definition, "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Assigned Contracts" means each of the contracts, leases, commitments, instruments and other agreements included in the Purchased Assets. Assigned Contracts shall not include any contract, lease, commitment, instrument or other agreement that is an Excluded Asset.

"Assignment and Assumption Agreement" has the meaning set forth in Section 3.2(a).

"Assumed Contract Liabilities" means the obligations and liabilities of Seller under or related to the Continuing Licenses and other Assigned Contracts that accrue from and after the Closing Date (it being understood that, as between the Purchaser and the Seller, the Purchaser is not assuming any liability under any Continuing License or other Assigned Contract

that accrued prior to the Closing Date, notwithstanding any provision in any Assignment and Assumption Agreement to the contrary).

"Assumed Liabilities" means: (a) the Assumed Payables, (b) the Assumed Contract Liabilities, (c) the Transaction Costs and (d) the Letter of Credit Liabilities.

"Assumed Payables" means (without duplication of any liability or other obligation otherwise included in the definition of Assumed Liabilities) the Seller's accounts payable and other current liabilities incurred in the ordinary course of business as of the Closing Date, provided that such accounts payable and other current liabilities: (a) would be recorded as such on a balance sheet of the Seller as of the Closing Date prepared in accordance with GAAP; and (b) are listed on Schedule A hereto; provided, however, that Assumed Payables shall not include any Excluded Liabilities.

"Balance Sheet" means the unaudited balance sheet of the Seller as of December 31, 2005.

"Bank" means JPMorgan Chase Bank, N.A. (or its successors or assigns).

"Bill of Sale" has the meaning set forth in Section 3.2(a).

"Business Day" means any day that is not a Saturday or Sunday or a legal holiday on which banks are authorized or required by law to be closed in New York, New York.

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"COBRA" has the meaning set forth in Section 4.14(b).

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Contingent Payment Target" means the realization from the net proceeds of the sale of the Inventory and the collection of the Accounts Receivable, in each case as reflected on the Balance Sheet, of an aggregate amount in excess of $15,530,000, which amount represents 90% of the sum of: (i) the Seller's gross trade Accounts Receivable as of December 31, 2005 (without deduction for any reserve reflected on the Seller's books is respect thereof); plus (ii) the Seller's Inventory as of December 31, 2005, valued at cost, net of a reserve of $423,000.

"Continuing Licenses" means all of the Licenses other than those listed as Excluded Assets on Schedule B hereto.

"Contracts" has the meaning set forth in Section 4.8(a).

"Employee Benefit Plan" has the meaning set forth in Section 4.15(a).

"Employment Agreement" means the employment agreement of even date herewith between the Purchaser and Heyman, in the form attached hereto as Exhibit A.

- 2 -

"Encumbrance" means any lien, pledge, mortgage, security interest, charge, restriction, adverse claim or other encumbrance of any kind or nature whatsoever.

"Environment" means soil, surface water, ground water, land, stream sediments, surface or subsurface strata, ambient air and any environmental medium.

"Environmental Law" means any Law that governs protection or improvement of human health or the Environment.

"Environmental Permit" means any permit, registration, certificate, certification, license, authorization, consent or approval of any Governmental Body required or issued under Environmental Laws.

"ERISA" has the meaning set forth in Section 4.14(a).

"ERISA Affiliate" has the meaning set forth in Section 4.14(a).

"Escrow Agent" means Arnstein & Lehr LLP or any successor to Arnstein & Lehr LLP, as escrow agent under the Escrow Agreement.

"Escrow Agreement" means that Escrow Agreement of even date herewith by and among the parties hereto and the Escrow Agent in the form attached hereto as Exhibit B.

"Excluded Assets" means the assets listed on Schedule B hereto.

"Excluded Liabilities" has the meaning set forth in Section 2.2(b).

"Financial Statements" means (a) the consolidated unaudited balance sheet and statements of earnings, shareholders' equity and cash flows of the Seller and the Hong Kong Subsidiary as of and for the year ended December 31, 2005, and (b) the audited balance sheets and statements of earnings, shareholders' equity and cash flows of the Seller as of and for each of the fiscal years ended December 31, 2004, 2003 and 2002, respectively, which have been reviewed by the Seller's outside accountants.

"GAAP" means U.S. generally accepted accounting principles, as in effect on the date of this Agreement, consistently applied.

"Governmental Body" means any governmental or regulatory body, agency, authority, commission, department, bureau, court, tribunal, arbitrator or arbitral body (public or private), or political subdivision, in any jurisdiction.

"Hazardous Materials" means without regard to amount or concentration (a) any element, compound, gas or chemical that is defined, listed, classified or regulated as hazardous or toxic under any Environmental Law, including, without limitation, any material or substance that is defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "subject waste," "contaminant," "toxic waste," "toxic substance" or similar term under any provision of any Environmental Law; (b) petroleum,

KL2:2428368.11

petroleum-based or petroleum-derived products; and (c) any substance containing polychlorinated biphenyls, asbestos, lead, urea formaldehyde or radon gas.

"Heyman" means Lawrence S. Heyman, currently the Chairman of the Board, President, Chief Executive Officer and principal stockholder of the Seller.

"Hong Kong Subsidiary" means Heyman Corporation (HK) Limited, a wholly-owned Subsidiary of Seller.

"I-Warn" means the Illinois WARN Act, 820 ILCS 65/1 *et seq.,* as amended from time to time.

"Indemnification Obligations" means the respective indemnification obligations of the Seller or the Purchaser under Article VII.

"Intellectual Property Rights" means all intellectual property rights, including trademarks, service marks, internet domain names, slogans, trade names, and the goodwill associated therewith, patents, copyrights, in both published and unpublished works, and all registrations and applications for any of the foregoing, franchises, licenses, proprietary know-how, proprietary trade secrets, proprietary customer lists, proprietary vendor lists, proprietary information, proprietary processes, proprietary formulae, proprietary computer programs and applications, proprietary layouts, proprietary specifications, proprietary designs, proprietary patterns, proprietary inventions, proprietary development tools and all documentation and media constituting, describing or relating to the above, including manuals, memoranda and records wherever created throughout the world.

"IRS" means the U.S. Internal Revenue Service.

"Knowledge" means the actual knowledge, after due inquiry, of:  in the case of Seller, Heyman, Eichelman, John Kuhn or Michelle Lopez; and in the case of the Purchaser, Arthur Rabin, Jason Rabin, Cory Silverstein or Mark Solomon.

"Landlord" means Ipers Continental Industrial, Inc., successor-in-interest to Prentiss Properties Acquisition Partners, L.P., and its successors and assigns, as landlord under the Vernon Hills Lease.

"Law" means any law in any jurisdiction (including common law), statute, code, ordinance, rule, regulation, permit, order, decree or other requirement or guideline.

"Letter of Credit Liabilities" has the meaning set forth in Section 2.3.

"Liabilities Undertaking" has the meaning set forth in Section 3.2(a).

"Licenses" means the brand licenses set forth in Section 4.7(f) of the Seller Disclosure Schedule.

"Loss", in respect of any matter, means any loss, liability, cost, expense, judgment, settlement or damage arising as a result of such matter, including reasonable

- 4 -

attorneys', consultants' and other advisors' fees and expenses relating to the investigation of such matter, reasonable costs of investigating or defending any claim, action, suit or proceeding or of avoiding the same or the imposition of any judgment or settlement and reasonable costs of enforcing any Indemnification Obligations; provided, however, that "Loss" shall not include any consequential or incidental damages, claims for lost profits, punitive damages or any damages based on multiple of earnings or other similar theory.

"Material Adverse Effect" means, with respect to the Seller, any material adverse effect on the business, operations, assets, condition (financial or otherwise), liabilities, or results of operations of the Seller (taken as a whole) or on the ability of the Seller to perform its obligations under this Agreement or any of the other Transaction Documents to which the Seller is a party or to consummate the transactions contemplated hereby or thereby.

"Necessary Consents" has the meaning set forth in Section 2.5.

"Non-Disclosure Agreement" means that certain Non-Disclosure Agreement, dated November 4, 2005, between Wear Me and the Seller.

"Note" or "2007 Note" means the subordinated promissory note in the principal amount of $285,000 or $785,000, issuable by the Purchaser to the Seller pursuant to Section 2.7 hereof upon satisfaction of the conditions set forth therein, substantially in the form of Exhibit C hereto.

"Notice of Set-Off Dispute" has the meaning set forth in Section 8.14(b).

"Permits" has the meaning set forth in Section 4.12(b).

"Permitted Encumbrances" has the meaning set forth in Section 4.6(c).

"Person" means an individual, partnership, venture, unincorporated association, organization, syndicate, corporation, limited liability company, or other entity, trust, trustee, executor, administrator or other legal or personal representative or any government or any agency or political subdivision thereof.

"Purchase Price" has the meaning set forth in Section 2.3.

"Purchased Assets" means all of the tangible and intangible assets, properties, rights and interests owned, leased or otherwise held by Seller including the following (but expressly excluding all of the Excluded Assets):

(a)     all accounts receivable generated by the Seller on or prior to the Closing Date, including all customer accounts, sales orders, rights to payment, vendor discounts, credits, rebates, and rights of Seller under all contracts, arrangements and other understandings between Seller and any of its customers, and the Seller's accounts receivable from Sammart (collectively, the "Accounts Receivable");

- 5 -

(b)    all lists of Seller relating to the Purchased Assets or the Business, including lists of existing, potential and prior customers, and existing, potential and past vendors or providers of service;

(c)    all rights of Seller in respect of prepaid insurance, prepaid rent, prepaid royalties and advertising/marketing fees and other prepaid expenses, all advances to suppliers and other deposits of cash and cash equivalents made by Seller with respect to any Purchased Asset, all deposits of cash and cash equivalents made by customers of Seller;

(d)    all inventory, work in process, goods in transit, open purchase orders, patterns, samples and designs owned or used by the Seller;

(e)    except for Excluded Assets, all Continuing Licenses, leases (and the leasehold interests related thereto), contracts, commitments, instruments and other agreements, written or oral, to which the Seller is a party including each contract, lease, commitment, instrument and other agreement listed in Section 4.8(a) of the Seller Disclosure Schedule, and all deposits or other forms of security related to any of the foregoing;

(f)    all of Seller's fixtures, furnishings and equipment, including without limitation computer equipment and telephone equipment;

(g)    all Seller IP Rights, including the name "Heyman";

(h)    to the extent transferable, all data processing or computer programs, flow charts and other firmware, software and source documents and related documentation;

(i)    all books, records, files, promotional materials and other documents relating to the Business, the Purchased Assets or the Assumed Liabilities, except as specifically excluded as Excluded Assets (the "Books and Records");

(j)    the Sun Life Shares;

(k)    all of Seller's cash and cash equivalents as of the Closing Date;

(l)    the full benefit of all representations, warranties, guarantees, indemnities, undertakings, certificates, covenants, agreements and the like and all security therefor received by the Seller on the purchase or other acquisition of any part of the Purchased Assets, to the extent assignable by the Seller;

(m)    all pending insurance claims asserted by the Seller, including the insurance claim in the amount of approximately $160,000 regarding a lost trailer which contained certain merchandise of the Seller;

(n)    all Tax refunds;

(o)    all rights and claims of Seller related to the Business (other than rights and claims related exclusively to the Excluded Assets), whether known or unknown, absolute or

- 6 -

contingent, matured or unmatured, or otherwise, against third parties, whether in tort, contract, or otherwise;

(p)    to the fullest extent permitted by Applicable Law, all permits, approvals, orders, authorization, consents, security clearances, licenses, franchises, exemptions of, or filings or registrations with, any Governmental Authority in any jurisdiction, which have been issued or granted to or are owned or used by Seller in connection with the Business and all pending applications therefor; and

(q)    the goodwill associated with the Business.

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Disclosure Schedule" means the disclosure schedule of the Purchaser accompanying this Agreement.

"Purchaser Indemnified Parties" has the meaning set forth in Section 7.2(a).

"Real Property" has the meaning set forth in Section 4.6(a)

"Real Property Documents" has the meaning set forth in Section 4.6(a)

"Real Property Interests" has the meaning set forth in Section 4.6(a)

"Release" means any releasing, spilling, leaching, pumping, leaking, pouring, emitting, emptying, discharging, depositing, injecting, escaping, dumping, migrating or disposing, whether intentional or otherwise, of any Hazardous Material into the Environment.

"Remedial Action" means all actions, including any capital on-going operating expenditures, required by any Governmental Body or voluntarily undertaken, on or in connection with any property, to (a) clean up, remove, contain, treat, or in any other way address any Hazardous Material or other substance; (b) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material or other substance so it does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor Environment; (c) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (d) bring facilities on any property and operations conducted thereon into compliance with all Environmental Laws and Environmental Permits. Remedial Action shall include, without limitation, remedial actions conducted off-site to address conditions emanating from any property currently or previously owned, leased or operated by the Seller.

"Seller" has the meaning set forth in the preamble.

"Seller Bank Agreements" means the Credit Agreement, dated as of May 27, 2004, as amended, between the Seller and the Bank, together with any ancillary agreements, notes and other instruments executed and delivered by the Seller and/or the Bank in connection therewith, true and complete copies of which have been delivered to the Purchaser.

- 7 -

"Seller Bank Debt" means the outstanding principal amount, accrued interest and any fees or other amounts required to be paid to the Bank in order to discharge in full, as of the Closing Date, the Seller's obligations to the Bank pursuant to the Seller Bank Agreements and to cause the Bank to release its liens on the Purchased Assets.

"Seller Disclosure Schedule" means the disclosure schedules of Seller accompanying this Agreement.

"Seller Indemnified Parties" has the meaning set forth in Section 7.3(a).

"Seller IP Rights" has the meaning set forth in Section 4.7(a).

"Seller IP Rights Agreements" has the meaning set forth in Section 4.7(b).

"Seller Products" means all products sold, designed, developed, made, manufactured and/or distributed by, or under license from, the Seller.

"Set-Off Demand" has the meaning set forth in Section 8.14(b).

"Set-Off Notice" has the meaning set forth in Section 8.14(b).

"Set-Off Review Period" has the meaning set forth in Section 8.14(b).

"Subsidiary" means with respect to any Person, any corporation or other business entity, whether or not incorporated, of which more than fifty percent (50%) of the securities or interests having ordinary voting power to elect members of the board of directors or managers, or other Persons performing similar functions with respect to such entity, are held, directly or indirectly, by such Person.

"Sun Life Shares" means those certain six hundred eighty-two (682) shares of stock held by Seller in Sun Life Financial Insurance Company.

"Tax" has the meaning set forth in Section 4.5(b).

"Tax Return" has the meaning set forth in Section 4.5(b).

"Threatened Release" means a substantial likelihood of a Release that requires action to prevent or mitigate damage to the Environment that may result from such Release.

"Threshold" has the meaning set forth in Section 7.2(b)(i).

"Transaction" means the sale by the Seller to the Purchaser of the Purchased Assets pursuant to, and the other transactions contemplated by, this Agreement and the Transaction Documents.

"Transaction Costs" means: (a) the Seller's accrued expenses as of the Closing Date in respect of the reasonable and ordinary transaction costs of the Acquisition, including (i) the fees and expenses of Fort Dearborn Advisors, LLC, (ii) the reasonable fees and expenses of the Seller's counsel, (iii) any fees or expenses paid or payable to the Bank on or after January 1,

- 8 -

2006, to the extent such fees or expenses were not reflected on the Balance Sheet, the aggregate amount of such Transaction Costs pursuant to this clause (a) to be limited in amount to the amount by which $750,000 exceeds the amount of any Transaction Costs of the type described in this clause (a) paid by the Seller prior to the Closing, except for payments to Fort Dearborn Advisors, LLC of up to $40,000; and (b) the amounts payable to the licensors under the Continuing Licenses in connection with the assignment to the Purchaser hereunder.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreements, the Bill of Sale, the Trademark Assignment Agreement, the Domain Name Assignment Agreement, the Liabilities Undertaking, the Employment Agreements, the Escrow Agreement, the Transition Services Agreement and, if issuable pursuant to Section 2.7 hereof, the Note.

"Transition Services Agreement" means the Transition Services Agreement of even date herewith between the Purchaser and the Seller in the form attached hereto as Exhibit D.

"2006 Adjusted Gross Revenues" has the meaning set forth in Section 2.7.

"U.S." means the United States of America.

"Vernon Hills Letter of Credit" means the standby letter of credit in the maximum amount of $288,000 issued under the Vernon Hills Lease by the Bank in favor of the Landlord, as beneficiary.

"Vernon Hills Lease" means that certain lease between the Seller and the Landlord, dated as of September 24, 1997, as amended, for the land, parking areas and building located at 375 North Fairway Drive, Vernon Hills, Illinois.

"WARN Act" means the U.S. Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2101 et seq., as amended from time to time.

## ARTICLE II

### Purchase and Sale

2.1    Purchase and Sale of Assets.  Subject to and upon the terms and conditions hereinafter set forth, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase from Seller, the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

2.2    Assumption of Liabilities.  (a)  Subject to and upon the terms and conditions hereinafter set forth, at the Closing, Purchaser shall assume and pay, perform and discharge when due, the Assumed Liabilities, and no others.  In the event of any claim against the Purchaser with respect to any of the Assumed Liabilities hereunder, Purchaser shall have, and the Seller hereby assigns to the Purchaser, any defense, counterclaim, or right of setoff that would have been available to the Seller if such claim had been asserted against the Seller. Nothing contained herein shall require the Purchaser to pay or discharge any debts or obligations

- 9 -

expressly assumed hereby so long as Purchaser shall in good faith contest or cause to be contested the amount or validity thereof.

(b)     Except for the Assumed Liabilities, neither the Purchaser nor any Affiliate of the Purchaser shall assume or be deemed to assume any liabilities or obligations of the Seller or the Business, all of which shall remain the sole and exclusive responsibility of the Seller. All such liabilities and obligations (other than the Assumed Liabilities) are referred to herein as the "Excluded Liabilities." Without limiting the generality of the foregoing, "Excluded Liabilities" includes:

(i)     any liability or obligation of the Seller in respect of any pending litigation, including the matters set forth in Section 4.10(a) of the Seller Disclosure Schedule;

(ii)     any third party claim or other obligation that is not an Assumed Liability and that arises out of or relates to the operation by the Seller of the Business prior to the Closing Date, whether such claim is first asserted prior or subsequent to the Closing Date, including the matters set forth in Section 4.10(b) of the Seller Disclosure Schedule;

(iii)     any obligation or liability whatsoever as to any employee or former employee of Seller with respect to any matter arising from his or her employment by Seller or arising in connection with any termination of such employee by Seller, including unpaid compensation, pension, retirement, accrued vacation, severance, employee welfare or other benefits, collective state or local law designed to protect employees, including equal employment laws, wrongful discharge laws, the WARN Act, I-WARN, or other rights, whether a claim with respect thereto is first asserted prior or subsequent to the Closing Date;

(iv)     with respect to any employee of Seller who accepts employment by Purchaser subsequent to the Closing, any obligation or liability to such Employee arising out of any facts or circumstances, or any condition of employment, that existed during the course of such Employee's employment with Seller and continued during the course of such Employee's employment with Purchaser;

(v)     any liability or obligation in respect of the Vernon Hills Lease or any other Excluded Asset, including without limitation any cost of removing Heyman's personal assets listed on Schedule B from the Vernon Hills facility or for the repair of any damage caused by such removal;

(vi)     any liability in respect of the Hong Kong Subsidiary; or

(vii)     except for those Taxes that are Assumed Payables and, as such, are set forth on Schedule A hereto, the aggregate amount of which does not exceed the amount set forth on said Schedule with respect thereto, all Taxes of the Seller relating to periods ending on or prior to the Closing Date and all periods beginning prior to the Closing Date and ending after the Closing Date, to the extent attributable to the period through and including the Closing Date.

2.3     Purchase Price. In consideration of the aforesaid sale, assignment, transfer, conveyance and delivery of the Purchased Assets, the Purchaser shall: (a) pay to the Seller the sum of $14,224.462.00 at the Closing, such amount to be paid by wire transfer of

- 10 -

immediately available funds at the Closing; (b) discharge the Transaction Costs at the Closing or, if not due and payable at the Closing, then when due and payable; (c) assume the liabilities under the Letters of Credit listed in Section 4.4(b) of the Seller Disclosure Schedule (the "Letter of Credit Liabilities"); (d) assume and discharge when due the other Assumed Liabilities of the Seller; (e) if earned, pay to the Seller the sum of $215,000 (the "Contingent Payment") within thirty (30) days following the end of the month in which the Contingent Payment Target is satisfied; and (f) if earned pursuant to Section 2.7 hereof, issue to the Seller the 2007 Note in the principal amount of $285,000 or $785,000 (as determined in accordance with Section 2.7). The Contingent Payment, if earned, payable pursuant to clause (e) above, shall be paid in immediately available funds by wire transfer to an account previously specified by the Seller. As used herein, "Purchase Price" means the sum of (X) the aggregate amount paid pursuant to clauses (a), (b) and (e) above; (Y) the principal amount of the 2007 Note, if issued pursuant to clause (f) above; and (Z) the aggregate amount of Assumed Liabilities (other than Transaction Costs, which are separately included under (X)) assumed by the Purchaser pursuant to Section 2.2(a) hereof.

2.4    Allocation of Purchase Price. The Purchase Price shall be allocated among the Purchased Assets in the manner agreed upon by the Purchaser and the Seller in good faith as promptly as practicable following the Closing. The Purchaser and the Seller shall each file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation. Neither the Purchaser nor the Seller shall take any position with respect to Taxes that is inconsistent with the agreed upon allocation, including in any audit or examination by any Governmental Body. The Purchaser and the Seller shall prepare and timely file such reports and information returns as may be required under Section 1060 of the Code to report the allocation of the Purchaser Price among the Purchased Assets as agreed pursuant to this Section 2.4.

2.5    Absence of Consents.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Purchased Asset if an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or Permit by, any third party (each such action, a "Necessary Consent"), would constitute a breach thereof or in any way adversely affect the rights of the Purchaser thereunder. In such event, the Seller and the Purchaser will use their commercially reasonable efforts to obtain the Necessary Consents for the assignment to the Purchaser of each such Purchased Asset, or any claim or right or any benefit arising thereunder, as the Purchaser may reasonably request. If any such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of the Seller thereunder so that the Purchaser would not in fact receive all such rights, the Seller and the Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible, under which the Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sublicensing, or sub-leasing to the Purchaser, or under which the Seller would enforce for the benefit of the Purchaser with the Purchaser assuming the Seller's obligations and any and all rights of the seller against a third party thereto. There shall be no adjustment to the Purchase Price in the event that the Seller

- 11 -

is either unable to obtain a Necessary Consent or is unable to sublicense, sublease or subcontract such Purchased Asset to the Purchaser.

(b)     Nothing in this Section 2.5 shall affect the liability (if any) of the Seller for failing to have disclosed the need for any such Necessary Consent and for otherwise breaching any representation, warranty, covenant or agreement set forth in this Agreement or any other Transaction Document relating to a Necessary Consent or the Purchased Asset to which such Necessary Consent relates.  When a Necessary Consent has been obtained, the Purchased Asset which is the subject of such Necessary Consent shall thereupon automatically be transferred, conveyed and assigned to the Purchaser (after the Closing Date), and the obligations and liabilities of the Seller with respect to such Purchased Asset shall automatically cease to be excluded from the Liabilities Undertaking by reason of this Section 2.5, without the payment of any additional consideration.

2.6     <u>Property Held by Others</u>.  With respect to any Purchased Assets to be transferred to the Purchaser hereunder which cannot be physically delivered to the Purchaser because they are not in the possession of the Seller, all of which Purchased Assets are listed in Section 2.6 of the Seller Disclosure Schedule, the Seller shall promptly upon request give irrevocable instructions to the person in possession thereof, with copies to the Purchaser, that all of the Seller's right, title and interest in and to the same has been vested in the Purchaser and that the same is to be held for the Purchaser's exclusive use and benefit, and Seller shall take such other actions after the Closing Date as the Purchaser may request to effectuate the foregoing.

2.7     <u>2007 Note</u>.  The Purchaser will issue the 2007 Note to the Seller in the principal amount of $285,000 in the event that the sum of: (a) the Seller's gross revenues for the period commencing January 1, 2006 through (but not including) the Closing Date; and (b) the gross revenues of the Purchaser's Heyman Division attributable to the Continuing Licenses for the period commencing on the Closing Date through and including December 31, 2006, excluding, in the case of clauses (a) and (b), gross revenues attributable to orders placed by employees of the Purchaser who were not employees of the Seller prior to the Closing Date (such sum, the "2006 Adjusted Gross Revenues"), equal or exceed $42,500,000 and are less than $55,000,000.  In the event that 2006 Adjusted Gross Revenues equal or exceed $55,000,000, the principal amount of the 2007 Note will be $785,000.  The Purchaser will have no obligation to issue the 2007 Note to the Seller in the event that 2006 Adjusted Gross Revenues are less than $42,500,000.  2006 Adjusted Gross Revenues shall be determined by the Purchaser's independent auditors in accordance with GAAP and the provisions of this Section.  The Purchaser shall deliver to the Seller a statement showing the calculation of 2006 Adjusted Gross Revenues not later than March 31, 2007, which statement shall be accompanied by the 2007 Note in the principal amount determined in accordance with this Section 2.7, duly executed by the Purchaser, if such statement reflects 2006 Adjusted Gross Revenues equal to or in excess of $42,500,000.  It shall be a condition to the Purchaser's obligation to issue the 2007 Note to the Seller that a duly authorized officer or representative of Seller signs such Note on the signature page thereof.  The Seller shall have the right to review, at its expense, all documents and other information of the Purchaser reasonably necessary to confirm the auditors' determination of 2006 Adjusted Gross Revenues.

## ARTICLE III

### Closing

3.1     Closing Date.  The closing of the transactions contemplated hereby (the "Closing") will be held at 10:00 a.m., prevailing local time, on the date hereof (the "Closing Date") at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, or at such other time or place as may be agreed to in writing by the Purchaser and the Seller.

3.2     Certain Actions at Closing.  At the Closing:

(a)     The Seller shall deliver, or cause to be delivered, to the Purchaser the following:

(i)     Assignment and Assumption Agreements (the "Assignment and Assumption Agreement") for the Assigned Contracts in the forms attached hereto as Exhibit E-1 through E-5, respectively, duly executed by the Seller and, in the case of each Continuing License, the licensor;

(ii)     a duly executed Bill of Sale (the "Bill of Sale") in the form attached hereto as Exhibit F;

(iii)     a duly executed Liabilities Undertaking (the "Liabilities Undertaking") in the form attached hereto as Exhibit G;

(iv)     a duly executed Trademark Assignment Agreement (the "Trademark Assignment Agreement") in the form attached hereto as Exhibit H;

(v)     a duly executed Domain Name Assignment Agreement (the "Domain Name Assignment Agreement") in the form attached hereto as Exhibit I;

(vi)     certified resolutions of the Board of Directors and the stockholders of the Seller approving and authorizing the transactions contemplated by this Agreement and the Transaction Documents;

(vii)     officer's certificates, executed by a duly authorized officer of the Seller, attaching true and complete copies of the Seller's articles of incorporation and bylaws or equivalent organizational documents and certifying as to the incumbency and signatures of the officers of the Seller executing any applicable agreements or documents;

(viii)     certificates of the Secretary of State of Delaware as to the due incorporation and good standing or equivalent certifications as to formation and good standing of the Seller, along with a copy of the certificate of incorporation of the Seller, certified by the Secretary of State of the State of Delaware as of a recent date;

(ix)     counterparts of the Escrow Agreement duly executed on behalf of the Seller, the Escrow Agent and Heyman, as Agent;

- 13 -

(x)    counterparts of an amendment to the Vernon Hills Lease duly executed by the Landlord and the Seller, satisfactory in form and substance to the Purchaser;

(xi)    counterparts of the Transition Services Agreement duly executed by the Seller;

(xii)    counterparts of a letter, satisfactory in form and substance to the Purchaser, duly executed by the Bank acknowledging that all Seller Bank Debt has been paid in full and delivering Termination Statements on Form UCC-3 terminating all Liens granted by the Seller to the Bank;

(xiii)    an opinion of Arnstein & Lehr LLP, counsel to the Seller, satisfactory in form and substance to the Purchaser;

(xiv)    counterparts of the Employment Agreement duly executed by Heyman; and

(xv)    certificates evidencing the Sun Life Shares, in transferable form, with stock transfer stamps attached.

(b)    The Purchaser shall cause to be delivered the following:

(i)    to the Seller, duly executed Assignment and Assumption Agreements for the Assigned Contracts;

(ii)    to the Seller, a duly executed Bill of Sale;

(iii)    to the Seller, a duly executed Liabilities Undertaking;

(iv)    to the Seller, a duly executed Trademark Assignment Agreement;

(v)    to the Seller, a duly executed Domain Name Assignment Agreement;

(vi)    to the Seller, certified resolutions of the Board of Directors of the Purchaser approving and authorizing the transactions contemplated by this Agreement and the Transaction Documents;

(vii)    to the Seller, officer's certificates, executed by a duly authorized officer of the Purchaser attaching true and complete copies of the Purchaser's articles of incorporation and bylaws or equivalent organizational documents and certifying as to the incumbency and signatures of the officers of the Purchaser executing any applicable agreements or documents;

(viii)    to the Seller, certificates of the Secretary of State of New York as to the due incorporation and good standing of the Purchaser, along with a copy of the certificate of incorporation of the Purchaser, certified by the Secretary of State of the State of New York as of a recent date;

(ix)    to the Seller, an opinion of Kramer Levin Naftalis & Frankel LLP, counsel to the Purchaser, satisfactory in form and substance to the Seller;

(x)    to the Seller, the Escrow Agent and Heyman, as Agent, counterparts of the Escrow Agreement duly executed by the Purchaser;

(xi)    to Heyman, a counterpart of his Employment Agreement duly executed by the Purchaser; and

(xii)    to the Seller, counterparts of the Transition Services Agreement duly executed by the Purchaser.

(c)    The Purchaser shall make the payments required pursuant to Section 2.3 hereof to be made on the Closing Date in accordance with said Section.

(d)    The Purchaser shall make the payments required pursuant to the Transition Services Agreement to be made on the Closing Date in accordance with said Agreement.

(e)    The Purchaser shall deliver to the Seller evidence satisfactory to the Seller of the assumption of the Letter of Credit Liabilities by the Purchaser.

## ARTICLE IV

### Representations and Warranties of Seller

The Seller hereby represents and warrants to the Purchaser as set forth below. For purposes of Sections 4.4 through 4.26 hereof (other than the final three sentences of Section 4.5(a) and Section 4.6(b)), all references to the Seller shall be deemed to include the Seller and the Hong Kong Subsidiary.

4.1    Organization and Good Standing.    The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Seller has corporate power and authority to own its properties and to carry on its Business as it is now being conducted by the Seller. The Seller is duly qualified to transact business and is in good standing in each jurisdiction wherein the nature of the business done or the property owned, leased or operated by it requires such qualification, except where the failure to be so qualified would not be reasonably likely to have a Material Adverse Effect. Except for the Hong Kong Subsidiary, the Seller has no Subsidiaries and does not own any ownership or equity interest in any Person. The holders of capital stock of the Seller, and the respective number of shares owned by each such holder, are listed in Section 4.1 of the Seller Disclosure Schedule.

4.2    Authorization.    The Seller has all requisite corporate power and authority to execute and deliver, carry out its obligations under and consummate the transactions contemplated by this Agreement and the other Transaction Documents (as applicable), and is not under any prohibition or restriction, contractual, statutory or otherwise, against doing so. This Agreement and each of the other Transaction Documents to which the Seller is a party have been duly executed and delivered by the Seller and, assuming due authorization, execution and delivery by the other parties thereto, constitute legal, valid and binding obligations of the Seller,

- 15 -

enforceable against it in accordance with their respective terms, except as such enforceability may be limited by principles of public policy and applicable bankruptcy, insolvency, moratorium or other laws affecting the rights of creditors generally and by general principles of equity.

       4.3    No Conflicts; Consents. Except as set forth in Section 4.3 of the Seller Disclosure Schedule, neither the execution and delivery by Seller of this Agreement or any of the Transaction Documents to which Seller is a party, nor the consummation of the transactions contemplated hereby or thereby, will, with or without notice or lapse of time or both, directly or indirectly, (i) conflict with or violate the articles of incorporation or by-laws of, or resolutions adopted by the directors or shareholders of, the Seller or the Hong Kong Subsidiary, (ii) conflict with, violate, result in the breach of any term of, result in the acceleration of performance of any obligation under, constitute a default under, give any Person the right to cancel, terminate or modify, or require the consent or approval of or any notice to or filing with any third party or Governmental Body under, (x) any note, mortgage, deed of trust, lease or other agreement or instrument to which Seller or the Hong Kong Subsidiary is a party or by which Seller, the Hong Kong Subsidiary or any of their respective properties or assets are bound, or (y) any Law, writ, injunction, or Permit of any Governmental Body having jurisdiction over the Seller, the Hong Kong Subsidiary or their respective properties or assets, or (iii) create an Encumbrance on any of the shares of capital stock or properties or assets of the Seller or the Hong Kong Subsidiary, except, with respect to clause (ii)(x) above, where such conflict, violation, breach or default, or the failure to obtain such consent or approval, give such notice or make such filing, would not reasonably be expected to have a Material Adverse Effect or prevent or materially delay or impair the performance of this Agreement or any of the Transaction Documents or the consummation of the transactions contemplated by this Agreement or any of the Transaction Documents.

       4.4    Financial Statements; Undisclosed Liabilities; Promotions and Allowances; Inventory.

       (a)    Except as set forth in Section 4.4(a) of the Seller Disclosure Schedule, the Financial Statements (true and complete copies of which have been previously delivered to the Purchaser or its representatives) have been prepared from the Books and Records of the Seller and the Hong Kong Subsidiary in accordance with GAAP applied on a consistent basis throughout the periods covered thereby and fairly present in all material respects the financial condition of the Seller as at their respective dates and the results of operations and cash flows of the Seller for the periods covered thereby. Except as set forth in Section 4.4(a) of the Seller Disclosure Schedule, the statements of operations included in the Financial Statements do not include any item of special or non-recurring income, except as specifically identified therein.

       (b)    As of the date of the Balance Sheet, other than those (i) set forth in Section 4.4(b) of the Seller Disclosure Schedule or (ii) which are reflected or reserved against on the Balance Sheet, the Seller had no liabilities, debts or obligations (whether absolute, accrued, contingent or otherwise). Since the date of the Balance Sheet, the Seller (i) has conducted its business in the ordinary course consistent with past practice, (ii) has not incurred any liabilities, debts or obligations (whether absolute, accrued, contingent or otherwise), except for liabilities incurred in the ordinary course of business consistent with past practice or relating to the Transaction, and (iii) notwithstanding anything to the contrary in clause (i) or (ii) of this sentence

- 16 -

and except as set forth in Section 4.4(b) of the Seller Disclosure Schedule, has not incurred any liability, debt or obligation (whether absolute, accrued, contingent or otherwise) to or of any Affiliate. Since the date of the Balance Sheet, there has been no Material Adverse Effect, and, to Seller's Knowledge, no event has occurred or facts or circumstances exist which would be reasonably likely to result in a Material Adverse Effect. All letters of credit issued on behalf of the Seller are set forth in Section 4.4(b) of the Seller Disclosure Schedule.

(c)     Section 4.4(c) of the Seller Disclosure Schedule sets forth (i) the material terms of all return, markdown, promotion, co-op advertising and other similar programs and allowances currently offered by the Seller to customers of the Seller and (ii) the amount of the reserve established by the Seller as of December 31, 2005, regarding the items described in clause (i).

(d)     The inventory reflected in the Financial Statements or thereafter acquired has been determined and valued in accordance with GAAP as reflected in the Financial Statements and the Seller's Books and Records at the lower of cost or market on a first-in, first-out basis. Except as set forth in Section 4.4(d) of the Seller Disclosure Schedule: (i) the Seller's inventory, whether raw materials, work-in-process, or other inventory (the "Inventory") is salable in the ordinary course of business without any material problems; (ii) the Seller's finished goods Inventory consist of items which are good and merchantable (as defined in the Uniform Commercial Code of the State of Illinois) in all material respects at normal mark-up in the ordinary course of business; and meets the Seller's standard warranty and applicable customer specifications; and (iii) no previously sold Inventory is subject to refunds materially in excess of that historically experienced by the Seller. All material commitments or orders for work-in-process were entered into in the ordinary course of business in a commercially reasonable manner. All Inventory purchased hereunder was manufactured, tagged and labeled in accordance with all federal and local laws. None of the inventory is subject to redelivery to U.S. Customs pursuant to 19 CFR 141.113 or other Customs laws or regulations. Reasonable and representative tests, made according to the procedures described in Section 4(a) of the Flammable Fabrics Act, show that the items of apparel products comprising the Inventory purchased hereunder are not so highly flammable as to be dangerous when worn by individuals. All Inventory was produced in compliance with all applicable requirements of Sections 6, 7 and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States Department of Labor issued under Section 14 thereof.

4.5     Taxes.

(a)     Seller has timely and accurately filed, or caused to be timely and accurately filed, in all material respects, all Tax Returns (as hereinafter defined) required to be filed by it, and has paid, collected or withheld, or caused to be paid, collected or withheld, in all material respects, all amounts of Taxes (as hereinafter defined) required to be paid, collected or withheld, other than such Taxes for which adequate reserves in the Balance Sheet have been established or which are being contested in good faith. There are no claims or assessments pending against Seller for any alleged deficiency in any Tax, there are no pending or, to Seller's Knowledge, threatened audits or investigations for or relating to any liability in respect of any Taxes, and Seller has not been notified in writing of any proposed Tax claims or assessments

against Seller (other than in each case, claims or assessments for which adequate reserves in the Balance Sheet have been established or which are being contested in good faith or are immaterial in amount). Seller has not executed any waivers or extensions of any applicable statute of limitations to assess any amount of Taxes. Except as set forth in Section 4.5(a) of the Seller Disclosure Schedule, there are no outstanding requests by Seller for any extension of time within which to file any Tax Return or within which to pay any amount of Taxes due on any Tax Return. There are no liens for Taxes on the assets of Seller except for statutory liens for current Taxes not yet due and payable. Seller is not liable for Taxes of any other Person (as a transferee or otherwise), is not currently under any contractual obligation to indemnify any person with respect to Taxes, and is not a party to any tax sharing agreement or any other agreement providing for payments by Seller with respect to Taxes. Seller is not a person other than a United States person within the meaning of the Code. Seller has qualified for and properly elected S Corporation status within the meaning of Section 1361(a)(1) of the Code (and any corresponding provisions of applicable state law) for federal and applicable state income tax purposes. Section 4.5(a) of the Seller Disclosure Schedule sets forth a list of all jurisdictions where the Seller files Tax Returns. The Seller has not been notified by any other jurisdiction that it is or may be subject to Tax in such jurisdiction.

(b)     For purposes of this Agreement, the term "Tax" shall mean any United States federal, state, local, non-United States or provincial income, gross receipts, property, sales, use, license, excise, franchise, employment, payroll, alternative or add-on minimum, ad valorem, transfer or excise tax, or any other tax, custom, duty, governmental fee or other like assessment or charge imposed by any Governmental Authority, together with any interest, penalty, additions to tax, and additional amounts imposed with respect thereto. The term "Tax Return" shall mean a report, return or other information (including any attached schedules or any amendments to such report, return or other information) required to be supplied to or filed with a Governmental Authority with respect to any Tax, including an information return, claim for refund, amended return or declaration or estimated Tax.

4.6     Real and Personal Property.

(a)     Section 4.6(a) of the Seller Disclosure Schedule contains a complete list by address of all real property leased, operated or used by the Seller (collectively, the "Real Property"). The Seller does not own, and within the past ten years has not owned, any real property. All real property leases or subleases of the Seller are in full force and effect, are valid and effective in accordance with their respective terms, and there is not, under any of such leases, any existing default or event of default (or event which with notice or lapse of time, or both, would constitute a default) by the Seller or, to the Seller's Knowledge, by the other party to such lease or sublease, except where the default or event of default could not reasonably be expected to have a Material Adverse Effect. True and complete copies of such leases and subleases have been made available to the Purchaser or its representatives. To the Seller's Knowledge, no litigation, condemnation, expropriation, eminent domain or similar proceeding affecting all or any portion of any Real Property is pending threatened. Except as sets forth in Section 4.6(a) of the Seller Disclosure Schedule, there are no oral agreements to which the Seller is a party or by which it is bound with respect to any Real Property. True and complete summaries of the terms of such oral agreements have been delivered to the Purchaser. No option to extend, renew or purchase with respect to any Real Property has been exercised. Except as set

- 18 -

forth in Section 4.6(a) of the Seller Disclosure Schedule, no guaranty or other undertaking with respect to the performance of any obligation arising under any Real Property Document has been delivered by the Seller.

(b)    The Seller has legal and valid title to, or in the case of leased assets and properties, valid and subsisting leasehold interests in, all of the material tangible personal properties and assets used in the operation of the business of the Seller, which, except as set forth in Section 4.6(b) of the Seller Disclosure Schedule, are free and clear of all Encumbrances, except for Permitted Encumbrances. Except as set forth in Section 4.6(b) of the Seller Disclosure Schedule, none of the properties or assets owned, leased, operated or used by the Seller is subject to any lease, sublease, license, sublicense or other agreement granting to any other Person any right to the use, occupancy or enjoyment of such property or any portion thereof. All of the Purchased Assets (other than intangible assets) which are not in the possession of the Seller are listed on Section 4.6(b) of the Seller Disclosure Schedule. Except as set forth in Section 4.6(b) of the Seller Disclosure Schedule, the Hong Kong Subsidiary has no assets or liabilities.

(c)    "Permitted Encumbrances" means (i) liens for Taxes not yet due and payable or which are being contested in good faith by appropriate proceedings and as to which appropriate reserves (to the extent required by GAAP) have been established in the books and records of the Seller; (ii) mechanics', materialmen's, carriers', warehousemen's, landlord's and similar liens securing obligations not yet delinquent or which are being contested in good faith by appropriate proceedings and as to which appropriate reserves (to the extent required by GAAP) have been established in the books and records of the Seller; (iii) with respect to personalty, such other inchoate liens and minor imperfections of title that do not in any material respect detract from the value of marketability thereof and do not interfere with the present or intended uses of the property subject thereto; and (iv) zoning, entitlement and other land use regulations promulgated by any Governmental Body.

4.7    Intellectual Property.

(a)    The Seller owns, or has the valid right to use or license, all Intellectual Property Rights as used in its Business as presently conducted (such Intellectual Property Rights hereinafter referred to as the "Seller IP Rights"). The Seller IP Rights are sufficient to conduct the Seller's business.

(b)    Except as set forth in Section 4.7(b) of the Seller Disclosure Schedule, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not (i) constitute a breach of any instrument or agreement governing any Seller IP Rights (the "Seller IP Rights Agreements"), (ii) cause the forfeiture or termination or give rise to a right of forfeiture or termination of any Seller IP Rights or (iii) impair the right of the Seller or, after the Closing, the Purchaser, to own, use or license any Seller IP Rights or portion thereof.

(c)    Except as set forth in Section 4.7(c) of the Seller Disclosure Schedule, there are no royalties, honoraria, fees or other payments payable by the Seller to any Person for the use by the Seller of any Seller IP Rights.

KL2:2428368.11

(d)    (i) The conduct of the business of the Seller, as presently conducted, does not and will not violate or infringe any Intellectual Property Rights of any other Person, and (ii) there is no pending or, to the Knowledge of the Seller, threatened claim or litigation contesting the validity, ownership, registrability, right to use or right to license any Seller IP Rights, nor, to the Knowledge of the Seller, is there any valid or reasonable basis for any such claim, nor has the Seller received any notice asserting that any Seller IP Rights or the proposed use, registration or license thereof infringes or otherwise violates, or will infringe or otherwise violate the rights of such Person.

(e)    The Seller has taken commercially reasonable and practicable steps to safeguard and maintain the secrecy and confidentiality of its trade secrets.  The Seller has delivered to the Purchaser or its representatives true and complete copies of all agreements that any directors, officers, employees or consultants of the Seller have executed regarding (i) the protection of proprietary information, and (ii) the assignment to the Seller of all Intellectual Property Rights arising from the services performed for the Seller by such persons. To the Seller's Knowledge, no current or prior directors, officers, employees, consultants or contractors of the Seller claim or have a right to claim an ownership interest in any Seller IP Rights.

(f)    Section 4.7(f) of the Seller Disclosure Schedule separately lists (i) all licenses and other agreements under which the Seller or any Person granted rights by the Seller uses any Seller IP Rights, and (ii) all licenses and other agreements (including the Licenses) under which the Seller or any Person granted rights by the Seller uses any Intellectual Property of any other Person. All such licenses and other agreements are valid, enforceable, in full force and effect, and without breach and will continue to be so without change in any provision or term thereof after the Closing.

(g)    (i) The Seller has not sent any notice, made any claim, or filed any action asserting that any Person's use of, or application for, any Intellectual Property Rights infringes upon or otherwise violates any Seller IP Rights, and (ii) to the Knowledge of the Seller, no Person is infringing upon or otherwise violating any Seller IP Rights, or has filed to register any Intellectual Property Rights which, if used by any third party, would infringe upon or otherwise violate the Seller IP Rights.

(h)    Section 4.7(h) of the Seller Disclosure Schedule sets forth a list of all patents, trademarks, service marks, trade dress, copyrights, slogans, trade names, and internet domain names comprising the Seller IP Rights, including without limitation all registrations and applications for any of the foregoing owned, licensed, used or filed by or on behalf of the Seller anywhere in the world. All applications and registrations listed in Section 4.7(h) of the Seller Disclosure Schedule, unless otherwise indicated, are in full force and effect and have not been cancelled, expired, rejected or abandoned. Except as set forth in Section 4.7(h) of the Seller Disclosure Schedule, there is no pending, existing or, to the Knowledge of the Seller, threatened opposition, interference, cancellation, proceeding or other legal or governmental proceeding before any court or Governmental Body against the applications or registrations listed in Section 4.7(h) of the Seller Disclosure Schedule.

4.8    Certain Contracts and Agreements.

- 20 -

(a)    Section 4.8(a) of the Seller Disclosure Schedule sets forth a true, complete and accurate list of each of the following contracts, agreements, arrangements, instruments or understandings, whether oral or written, to which the Seller is a party or by which the Seller or its assets or properties are bound (collectively, the "Contracts"):

(i)    each employment or other similar agreement providing for compensation, severance or a fixed term of employment in respect of services performed by any employee of the Seller;

(ii)    each management, consulting, subcontractor, retainer or other similar type of agreement under which services are provided by any Person to the Seller in excess of $50,000 per annum or $75,000 in the aggregate;

(iii)    each agreement for services and supplies provided by any other Person to the Seller with a term of more than one (1) year or requiring payments of more than $50,000 per annum or $75,000 in the aggregate;

(iv)    each agreement for the supply of products or services by the Seller to any other Person with a term of more than one (1) year (other than those that are terminable upon not more than thirty (30) days' notice by the Seller without penalty) or involving payments of more than $50,000 per annum or $75,000 in the aggregate;

(v)    each agreement containing covenants limiting, in any material respect, the freedom of the Seller to conduct business in any area or territory or line of business, to buy or sell particular goods or services, to buy or sell goods or services from any other Person or to solicit customers, employees or other service providers;

(vi)    each agreement with an Affiliate or with any entity which an officer or director of the Seller holds an interest;

(vii)    each lease (as lessor, lessee, sublessor or sublessee) of any real property;

(viii)    each lease (as lessor, lessee, sublessor or sublessee) of any tangible personal property requiring payment during its term or any extension or renewal thereof in excess of $50,000;

(ix)    each license (as licensor, licensee, sublicensor or sublicensee) of any Intellectual Property Rights (other than licenses of commercially available, "packaged, off the shelf," shrink-wrap or click-through computer software);

(x)    each agreement under which any money has been or may be borrowed or loaned by the Seller, or any note, bond, factoring agreement, indenture or other evidence of indebtedness has been issued or assumed by the Seller, and each guaranty by the Seller (including "take-or-pay" and "keepwell" agreements) of any evidence of indebtedness or other obligation, or of the net worth, of any Person;

- 21 -

(xi)    each mortgage agreement, deed of trust, security agreement, purchase money agreement, conditional sales contract or capital lease of an amount or value in excess of $25,000 annually;

(xii)    each partnership, joint venture agreement or similar agreement providing for the joint performance of work or services;

(xiii)    each agreement or commitment that requires the Seller to make unpaid capital expenditures in excess of $50,000;

(xiv)    each agreement containing a change of control provision;

(xv)    each manufacturing, distribution or sourcing agreement or arrangement;

(xvi)    each agreement or other arrangement pursuant to which the Seller is obligated to accept returned merchandise or grant credit for unsold merchandise in excess of $10,000, other than as set forth in standard form, non-negotiated purchase orders or confirmations;

(xvii)    each agreement or other arrangement providing for the development of software for, or license of software (other than off-the-shelf, shrink-wrap, or click-through software applications) or Intellectual Property Rights to, the Seller, which software or Intellectual Property Rights are used or incorporated in any of the Seller Products, including rights of publicity;

(xviii)    each material agreement with respect to any Seller IP Rights;

(xix)    each agreement or arrangement with respect to advertising (including co-op advertising) or any concept shops or in-store sales environments (i.e. shop in shops) for any Seller Product;

(xx)    each agreement that obligates the Seller to indemnify a third party; and

(xxi)    each other agreement (or group of agreements) having an indefinite term or a fixed term of more than one (1) year (other than those that are terminable upon not more than thirty (30) days' notice by the Seller without penalty) or requiring payments by the Seller in excess of $50,000 per year or the loss of which could reasonably be expected to have, directly or indirectly, individually or in the aggregate, a Material Adverse Effect.

Complete copies of all written (and summaries of all oral) Contracts required to be disclosed pursuant to this Section 4.8(a) have been made available to the Purchaser or its representatives.

(b)    Except as set forth in Section 4.8(b) of the Seller Disclosure Schedule, each of the Contracts that does not expire in accordance with its terms is in full force and effect and is enforceable by the Seller in accordance with its respective terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium and other similar laws

- 22 -

affecting creditors' rights generally and by general principles of equity. Except as set forth in Section 4.8(b) of the Seller Disclosure Schedule, the Seller is not (with or without the lapse of time or the giving of notice, or both) in breach of or in default under any of the Contracts, and, to the Knowledge of the Seller, no other party to any of the Contracts is (with or without the lapse of time or the giving of notice, or both) in breach of or in default under any of the Contracts.

4.9    Insurance. All material insurance policies currently maintained by the Seller, or under which the Seller is insured, are listed in Section 4.9 of the Seller Disclosure Schedule. All such insurance policies are with reputable insurance carriers and provide coverage appropriate in character and amount for the businesses of Seller and its properties and assets. Except as set forth in Section 4.9 of the Seller Disclosure Schedule, there are no material pending claims with respect to the Seller or its properties or assets under any such insurance policy. The Seller has not received written notice of cancellation or non-renewal of any such policy. The key man life insurance policy issued by Sun Life Financial Insurance Company owned by the Seller insuring Heyman lapsed in January 2006. Such policy was a term policy and had no cash surrender value. The Seller does not own any other policy insuring Heyman's life.

4.10    Litigation.

(a)    Except as set forth in Section 4.10(a) of the Seller Disclosure Schedule, and except with respect to environmental matters (which are addressed in Section 4.15 of this Agreement), there is no lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding pending or, to the Knowledge of the Seller, threatened against the Seller or any of its properties or assets, or any director, officer or, to the Knowledge of the Seller, employee of the Seller, in his or her capacity as such, and the Seller is not identified as a party subject to any restrictions or limitations under any judgment, order or decree of any Governmental Body.

(b)    Except as set forth in Section 4.10(b) of the Seller Disclosure Schedule, there are no existing claims against the Seller for goods which are defective or fail to meet any product warranties or contract, customer or industry standards.

4.11    Condition and Sufficiency of Assets. The properties and assets owned, leased, operated and used by the Seller in the conduct or operation of its Business are in good operating condition and repair (reasonable wear and tear excepted), are suitable for the purposes for which they are used and are all of the material properties and assets necessary for the conduct and operation of the Business of the Seller as currently conducted. The Seller is the sole owner of all material properties and assets, including trademarks, used by the Seller in the conduct or operation of the Business of the Seller, except for properties and assets leased or licensed to the Seller pursuant to Contracts listed in Section 4.8(a) of the Seller Disclosure Schedule, to which the Seller has a valid lease or license.

4.12    Compliance with Law; Permits; Customs.

(a)    Except as set forth in Section 4.12(a) of the Seller Disclosure Schedule, during the five (5) years immediately preceding the date hereof, the Seller is and has been in compliance in all material respects with all applicable Laws governing the conduct or operation

- 23 -

of its business, and with all of its Permits. During such five-year period, the Seller has not received any written notice from any Governmental Body of any violation of any such Law or Permit, and to the Knowledge of the Seller, no such violation has been threatened.

(b)     All material governmental licenses, approvals, authorizations, registrations, consents, orders, certificates, decrees, franchises and permits (collectively, "Permits") of the Seller are listed in Section 4.12(b) of the Seller Disclosure Schedule. The Permits are all of the material Permits necessary for the Seller's ownership and operation of its properties and assets, the manufacturing, import, marketing, sale and distribution of the Seller Products by the Seller and the conduct and operation of its Business. Such Permits are in full force and effect in all material respects, and no proceeding is pending or, to the Knowledge of the Seller, threatened, seeking the revocation or limitation of any such Permit.

(c)     The Seller is not the importer of record for any product other than a Seller Product.

(d)     Notwithstanding and in addition to the foregoing, the Seller and, to the Knowledge of the Seller, the Seller's employees, agents and representatives are, and at all times have been, in compliance with all applicable Laws and regulations relating to importing and exporting, customs and national and international trade with respect to business conducted by the Seller or for which the Seller could be held liable, including, without limitation, the accuracy of all statements and representations made to any Governmental Body (including the U.S. Customs Service, the U.S. Department of Homeland Security, the U.S. Federal Trade Commission, and the U.S. Consumer Products Safety Commission), the timely and accurate filing of all reports, schedules and forms required to be filed with any Governmental Body and the timely and accurate reporting and payment of all duties, taxes, fees, payments or other governmental obligations.

(e)     The Seller and, to the Knowledge of the Seller, the Seller's employees, agents and representatives have not provided any assistance, directly or indirectly, to the maker of any goods the Seller has imported, including, without limitation, equipment or materials, which assistance would be subject to a duty, tax, fee or other payment, other than such assistance which has been fully and accurately disclosed to the appropriate Governmental Bodies and for which such duty, tax, fee or other payment has been fully paid.

(f)     The Seller and, to the Knowledge of the Seller, the Seller's employees, agents and representatives have accurately prepared and maintained all records with respect to the business conducted by the Seller or for which the Seller could be held liable relating to importing and exporting, customs and international trade, as required by Law.

(g)     Section 4.12(g) of the Seller Disclosure Schedule sets forth all liabilities or obligations owing by the Seller or, to the Knowledge of the Seller, the Seller's employees, agents or representatives to the U.S. Customs Service or any Governmental Body in connection with the purchase, importation or attempted importation of any product by the Seller or for which the Seller could be held liable, including but not limited to: duties, taxes, fees and interest thereon; liquidated damages; penalties; claims and assessments (whether actual or potential and whether or not yet asserted by the U.S. Customs Service, any Governmental Body or some third party).

(h)    The Seller has not received written notice of any pending audits, inquiries, investigations, claims, notices or demands for duties, fines, penalties, seizures, forfeitures, or liquidated damages by any Governmental Body (including but not limited to the U.S. Customs Service, U.S. Department of Homeland Security, U.S. Federal Trade Commission, U.S. Consumer Products Safety Commission, U.S. Department of Justice, any Office of the U.S. Attorney or any other agency of the U.S. government) arising out of any transactions or importation of merchandise by or for the Seller and, to the Knowledge of the Seller, the Seller has not committed any acts or omissions which could give rise to any such inquiry, investigation, claim, notice or demand.

4.13    Employees.

(a)    Section 4.13(a) of the Disclosure Schedule sets forth, as of December 31, 2005, the total number of employees of the Seller. To the best of Seller's Knowledge, the Seller generally has satisfactory relationships with its employees.

(b)    Except as set forth in Section 4.13(b) of the Seller Disclosure Schedule, the Seller (i) is and has been in material compliance with all applicable Laws (including any legal obligation to engage in affirmative action), agreements and contracts relating to former, current, and prospective employees, independent contractors and "leased employees" (within the meaning of Section 414(n) of the Code) of the Seller, workplace practices, and terms and conditions of employment with the Seller or retention by the Seller, including all such Laws, agreements and contracts relating to wages, hours, collective bargaining, employment discrimination, immigration, disability, civil rights, fair labor standards, occupational safety and health, workers' compensation, pay equity, wrongful discharge and violation of the potential rights of such former, current, and prospective employees, independent contractors and leased employees, and (ii) has timely prepared and filed all appropriate forms (including Immigration and Naturalization Service Form I-9) required by any relevant Law or Governmental Body. The Seller is not engaged in any unfair labor practice.

(c)    Other than as required by relevant Law, no collective bargaining agreement with respect to the business of the Seller is currently in effect or, to the Knowledge of Sellers and the Seller, being negotiated. The Seller has no obligation to negotiate any other collective bargaining agreement, and, to the Knowledge of the Seller, no employees of the Seller that are not already so covered desire to be covered by a collective bargaining agreement.

(d)    No strike, slowdown or work stoppage is occurring or has occurred within the past five (5) years, nor, to the Knowledge of the Seller, is threatened or has been threatened within the last year, with respect to the employees of the Seller.

(e)    There is no representation claim or petition pending before any labor agency (including the U.S. National Labor Relations Board) of which the Seller has been notified and, to the Knowledge of the Seller, no question concerning representation has been raised or threatened respecting the employees of the Seller.

(f)    Except as set forth in Section 4.13(f) of the Seller Disclosure Schedule, no written notice has been received by the Seller of any complaint or proceeding filed against the

KL2:2428368.11

Seller claiming that the Seller has violated any applicable employment standards, human rights or other labor legislation or employment Laws, or, to the Knowledge of the Seller, against any of the employees of the Seller or threatened to be filed against the Seller or any of the employees of the Seller before any agency, labor relations board or Governmental Body (including, but not limited to, the U.S. National Labor Relations Board and U.S. Equal Employment Opportunity Commission). No written notice has been received by the Seller of the intent of any agency or other Governmental Body responsible for the enforcement of labor or employment Laws to conduct an investigation of the Seller, and no such investigation is in progress.

(g)     There are no outstanding orders or charges of any Governmental Body against the Seller under any occupational health or safety legislation and, to the Knowledge of the Seller, none have been threatened. All material levies, assessments and penalties made against the Seller pursuant to all applicable workers compensation legislation as of the date of the Interim Balance Sheet have been paid or have been reserved for or accrued on the Interim Balance Sheet by the Seller and the Seller has not, as of the Closing Date, been reassessed under any such legislation. To the Knowledge of the Seller, there have been no such material levies, assessments or penalties imposed or threatened against the Seller since the date of the Interim Balance Sheet.

(h)     A schedule has been delivered to the Purchaser setting forth a true, correct and complete list, as of December 31, 2005, of all of the employees, officers, independent contractors and consultants of the Seller, and with respect to each such employee, officer, independent contractor and consultant: (i) the total compensation (including, without limitation, salary, bonuses, incentive compensation, fees or other remuneration) received by such individual in the immediately preceding fiscal year of the Seller, (ii) such individual's current compensation, (iii) such individual's current title, (iv) the number of years of continuous service of such employee or officer and the period of service of such independent contractor or consultant with the Seller, and (v) outstanding loans to such individuals. Amounts have been withheld by the Seller from its employees for all periods in compliance with applicable law. Federal, state, local and foreign returns, as required by applicable Law, have been filed by the Seller for all periods for which returns were due with respect to employee income tax withholding, social security and unemployment taxes, and the amounts due and payable have been paid, together with any interest and penalties that are due as a result of the Seller's failure to file such returns when due and pay when due the amounts due. Section 4.13(h) of the Seller Disclosure Schedule accurately sets forth a complete and correct list of all employment, management, consulting or other agreements with any Persons retained by the Seller as employees, "leased employees" (within the meaning of Section 414(n) or (o) of the Code or other similar Law), management or other independent consultants, sales representatives, sales or commission agents and distributors, true and complete copies of which have been delivered to the Purchaser or its representatives. Except as set forth in Section 4.13(h) of the Seller Disclosure Schedule, the Seller has not increased the compensation or benefits any employee since January 1, 2006.

(i)     Section 4.13(i) of the Seller Disclosure Schedule accurately sets forth all severance or continuing payment obligations of the Seller, as well as all unpaid severance or continuing payments of any kind (other than pursuant to a plan or program described in Section 4.14 hereof) which are due or claimed in writing to be due from the Seller to any Person whose

- 26 -

employment with the Seller was terminated. Except as set forth in Section 4.13(i) of the Seller Disclosure Schedule, the consummation of the transactions contemplated hereby, either alone or in combination with another event, with respect to each director, officer, employee, independent contractor and consultant of the Seller, will not result in (A) any payment (including, without limitation, severance, unemployment compensation or bonus payments) becoming due under any employee benefit plan, agreement, arrangement or commitment, (B) any increase in the amount of compensation, benefits or fees payable to any such individual or (C) any acceleration of the vesting or timing of payment of benefits, compensation or fees payable to any such individual.

(j)     Section 4.13(j) of the Disclosure Schedule accurately sets forth all accrued, but unused, vacation time of all employees of the Seller as of December 31, 2005 and the Seller's policies with respect thereto.

(k)     Except as set forth Section 4.13(k) of the Seller Disclosure Schedule, each employee of the Seller is employed on an at-will basis and the Seller has no written or oral agreements with any employees that would interfere with the ability to discharge such employees. The Seller has not promised or represented or distributed any written material to any of its shareholders, directors, officers, employees, consultants, independent contractors, agents, representatives or other personnel that any of such persons will be employed or engaged by or receive any particular benefits subsequent to the Closing Date.

(l)     Section 4.13(l) of the Seller Disclosure Schedule accurately sets forth summaries of the significant terms and conditions of any and all material arrangements (oral or written) between the Seller and sales representatives, sales agents, distributors, and any other independent contractors. Such arrangements are in full force and effect and are enforceable by the Seller in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium and other similar laws affecting creditors' rights generally and by general principles of equity. Except as set forth in Section 4.13(l) of the Seller Disclosure Schedule, the Seller is not (with or without the lapse of time or the giving of notice, or both) in breach of or in default under, in any material respects, any arrangements with sales representatives, sales agents, distributors or any other independent sales contractors, and, to the Knowledge of the Seller, no other party to any of such arrangements is (with or without the lapse of time or the giving of notice, or both) in breach of or in default under any of such arrangements.

(m)     To the Knowledge of the Seller, no contractor, manufacturer or supplier used by or under contract with the Seller is in material violation of any Law relating to labor or employment matters.

(n)     Section 4.13(n) of the Seller Disclosure Schedule accurately sets forth: (i) the name, job title, hire date and last known home address of all individuals employed by the Seller at any time between November 1, 2005 and the Closing Date; (ii) the termination date, if any, for each such employee; and (iii) whether each such employee was employed for an average of fewer than 20 hours per week during the period of November 1, 2005 and the Closing Date.

4.14    Employee Benefit Plans.

- 27 -

(a)     Section 4.14(a) of the Seller Disclosure Schedule lists all Employee Benefit Plans. "Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA") and any other plan, policy, program, practice or agreement (whether written or oral) providing compensation or other benefits to any current or former officer, employee or consultant (or to any dependent or beneficiary thereof), of the Seller or any ERISA Affiliate, which are now, or within the last six (6) years were, maintained by the Seller or any ERISA Affiliate, or with respect to which the Seller or any ERISA Affiliate has or may have any liability, including but not limited to any obligation to contribute, including all employee pension, profit-sharing, savings, retirement, incentive, bonus, deferred compensation, vacation, holiday, cafeteria, medical, disability, life, accident or other insurance, stock purchase, stock option, stock appreciation right, phantom stock, restricted stock or other equity-based compensation plans, and any other plans, policies, programs or practices. "ERISA Affiliate" means any entity (whether or not incorporated) other than the Seller that, together with the Seller, is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code, of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code, or in the case of any Employee Benefit Plan subject to Part 3 of Subtitle B of Title I of ERISA, of an affiliated service group within the meaning of Section 414(m) of the Code.

(b)     To the Knowledge of the Seller, no employee will be subject to tax under Section 409A of the Code with respect to any Employee Benefit Plan.

(c)     The Seller has delivered to the Purchaser or its representatives true and complete copies of (i) each Employee Benefit Plan (including all amendments) and summary plan description (including all summaries of material modifications), and (ii) with respect to any Employee Benefit Plan, where applicable, the most recent Internal Revenue Service opinion or determination letter.

(d)     Neither the Seller nor any ERISA Affiliate maintains or contributes to or has ever maintained or contributed to an Employee Benefit Plan (including, without limitation, any "multiemployer plan" within the meaning of Section 3(37) of ERISA) subject to Title IV of ERISA, and no condition exists as a result of which the Seller could have any liability under Title IV of ERISA.

(e)     Each Employee Benefit Plan which is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA and which is intended to be qualified under Section 401(a) of the Code has received a favorable opinion or determination letter from the Internal Revenue Service and, to the Knowledge of the Seller, nothing has occurred and no circumstances exist that would reasonably be expected to cause the disqualification of such plan. Each Employee Benefit Plan is and has been maintained in form and operation in all material respects in compliance with its terms and all applicable Laws, including, without limitation, ERISA and the Code. As of and including the date of the Closing, the Seller shall have made all contributions required to be made by the Seller up to and including the date of the Closing with respect to each Employee Benefit Plan.

- 28 -

(f)     With respect to each Employee Benefit Plan, (i) no "party in interest" or "disqualified person" (as defined in Section 3(14) of ERISA or Section 4975 of the Code, respectively) has at any time engaged in a transaction which could subject the Purchaser, directly or indirectly, to a tax, penalty or liability for prohibited transactions imposed by ERISA or the Code.

(g)     Each Employee Benefit Plan which is a "welfare plan" within the meaning of Section 3(1) of ERISA and which provides health, disability or death benefits is fully insured.

(h)     No Employee Benefit Plan provides for the continuation of medical, health or other welfare benefits or coverage for any participant or any dependent or beneficiary of any participant after such participant's retirement or other termination of employment, except as may be required by COBRA or any other applicable law, and the Seller has not agreed or promised to provide any such benefits or coverage.

(i)     The Seller has not proposed or agreed to any increase in benefits under any Employee Benefit Plan (or the creation of new benefits or a new Employee Benefit Plan ) or change in employee coverage which would increase the expense of maintaining any such Employee Benefit Plan.

(j)     The consummation of the transactions contemplated by this Agreement, either alone or in combination with any other event, will not result in any new benefits, an increase in the amount of compensation or benefits or an acceleration of the vesting or timing of payment of any benefits or compensation payable in respect of any employee.

4.15    Environmental Matters.

(a)     Except as set forth in Section 4.15 of the Seller Disclosure Schedule:

(i)     the Seller is and has been in compliance with all applicable Environmental Laws;

(ii)    the Seller possess all Environmental Permits that are required for the lawful operation of its business and each such Environmental Permit is in full force and effect and the Seller is in compliance with such Environmental Permits and no proceeding is pending or to Seller's Knowledge threatened to revoke, suspend, modify or limit any such Environmental Permit;

(iii)   the Seller has not received any oral or written notice with respect to the business of, or any property owned or leased by, the Seller from any Governmental Body or Person alleging that the Seller is in violation of any Environmental Law;

(iv)    the Seller has not received any oral or written notice from any Governmental Body or Person that it is or may be required to conduct any Remedial Action as a result of the operation of its business, or on any property currently or formerly owned or leased by the Seller;

- 29 -