(f)      With respect to each Employee Benefit Plan, (i) no "party in interest" or "disqualified person" (as defined in Section 3(14) of ERISA or Section 4975 of the Code, respectively) has at any time engaged in a transaction which could subject the Purchaser, directly or indirectly, to a tax, penalty or liability for prohibited transactions imposed by ERISA or the Code.

(g)      Each Employee Benefit Plan which is a "welfare plan" within the meaning of Section 3(1) of ERISA and which provides health, disability or death benefits is fully insured.

(h)      No Employee Benefit Plan provides for the continuation of medical, health or other welfare benefits or coverage for any participant or any dependent or beneficiary of any participant after such participant's retirement or other termination of employment, except as may be required by COBRA or any other applicable law, and the Seller has not agreed or promised to provide any such benefits or coverage.

(i)      The Seller has not proposed or agreed to any increase in benefits under any Employee Benefit Plan (or the creation of new benefits or a new Employee Benefit Plan ) or change in employee coverage which would increase the expense of maintaining any such Employee Benefit Plan.

(j)      The consummation of the transactions contemplated by this Agreement, either alone or in combination with any other event, will not result in any new benefits, an increase in the amount of compensation or benefits or an acceleration of the vesting or timing of payment of any benefits or compensation payable in respect of any employee.

4.15    Environmental Matters.

(a)     Except as set forth in Section 4.15 of the Seller Disclosure Schedule:

(i)      the Seller is and has been in compliance with all applicable Environmental Laws;

(ii)     the Seller possess all Environmental Permits that are required for the lawful operation of its business and each such Environmental Permit is in full force and effect and the Seller is in compliance with such Environmental Permits and no proceeding is pending or to Seller's Knowledge threatened to revoke, suspend, modify or limit any such Environmental Permit;

(iii)    the Seller has not received any oral or written notice with respect to the business of, or any property owned or leased by, the Seller from any Governmental Body or Person alleging that the Seller is in violation of any Environmental Law;

(iv)    the Seller has not received any oral or written notice from any Governmental Body or Person that it is or may be required to conduct any Remedial Action as a result of the operation of its business, or on any property currently or formerly owned or leased by the Seller;

- 29 -

(v)    there has been no Release of a Hazardous Material as a result of the Seller's operations at or from any real property owned or leased by the Seller that would subject the Seller to liability under any Environmental Law, nor has the Seller received written notice that it is a potentially responsible party under any Environmental Law; and

(vi)    the Seller has not managed, handled, generated, manufactured, refined, recycled, discharged, emitted, buried, processed, produced, reclaimed, stored, treated, transported, or disposed of any Hazardous Substance, except in compliance with all Environmental Laws.

(b)    The Seller has provided the Purchaser or its representatives with all environmental audits or assessments in the possession or control of the Seller relating to the business of, or any property owned or leased by, the Seller.

4.16    Bank Accounts and Powers of Attorney. Section 4.16 of the Seller Disclosure Schedule sets forth the name of each bank in which the Seller has an account, lock box or safe deposit box, the number of each such account, lock box and safe deposit box, and the names of all Persons authorized to draw thereon or have access thereto. Except as set forth in Section 4.16 of the Seller Disclosure Schedule, no Person holds any power of attorney from the Seller.

4.17    Absence of Certain Changes. Since the date of the Balance Sheet and except as set forth in Section 4.17 of the Seller Disclosure Schedule, the Seller has operated its business in the ordinary course consistent with past practice, and there has not occurred any event, development or change which, individually or in the aggregate, has had or could be reasonably expected to have a Material Adverse Effect. Without limiting the generality of the immediately preceding sentence and except as set forth in Section 4.17 of the Seller Disclosure Schedule, since December 31, 2005, the Seller has not:

(i)    amended or otherwise modified its Articles of Incorporation or By-laws (or similar organizational documents) or altered, through merger, liquidation, reorganization, restructuring or in any other fashion its corporate structure or ownership;

(ii)    mortgaged, pledged or granted any security interest in any of its assets, except Permitted Encumbrances and security interests solely in tangible personal property granted pursuant to any purchase money agreement, conditional sales contract or capital lease under which, solely with respect to conditional sales contracts and capital leases, there exists an aggregate future liability not in excess of $50,000 per contract or lease (which amount was not more than the purchase price for such personal property and which security interest does not extend to any other item or items of personal property);

(iii)    declared, set aside, made or paid any dividend or other distribution to any holder with respect to its capital stock or other securities;

(iv)    redeemed, purchased or otherwise acquired, directly or indirectly, any of its capital stock or other securities;

- 30 -

(v)    increased the compensation of any of its non-executive employees, except in the ordinary course of business consistent with past practice, or increased the compensation of any of its executive officers;

(vi)    adopted or, except as required by Law, amended, any Employee Benefit Plan;

(vii)    extended, terminated or modified any Contract, permitted any renewal notice period or option period to lapse with respect to any Contract or received any written notice of termination of any Contract, in each case, involving a total remaining commitment by or to the Seller of at least $10,000, and except for terminations of Contracts upon their expiration during such period in accordance with their terms;

(viii)    incurred or assumed any indebtedness for borrowed money or guaranteed any obligation or the net worth of any Person, other than in the ordinary course of business consistent with past practice;

(ix)    incurred any liability, debt or obligation (whether absolute, accrued, contingent or otherwise) to or of any Affiliate;

(x)    discharged or satisfied any Encumbrance other than those then required to be discharged or satisfied during such period in accordance with their original terms;

(xi)    paid any material obligation or liability (absolute, accrued, contingent or otherwise), whether due or to become due, except for any current liabilities and the current portion of any long term liabilities shown on the Financial Statements or incurred since the date of the Balance Sheet in the ordinary course of business consistent with past practice;

(xii)    sold, transferred, leased to others or otherwise disposed of any assets having a fair market value in excess of $50,000, except sales of Inventory in the ordinary course of business and dispositions of obsolete assets no longer used or useful in the business of the Seller, in each case in the ordinary course of business consistent with past practice;

(xiii)    cancelled, waived or compromised any material debt or claim;

(xiv)    suffered any damage or destruction to, loss of, or condemnation or eminent domain proceeding relating to any of its tangible properties or assets (whether or not covered by insurance) which has had or would reasonably be likely to have a Material Adverse Effect;

(xv)    lost the employment services of any employee whose annual salary exceeded $75,000;

(xvi)    made any loan or advance to any Person, other than travel and other similar routine advances to employees in the ordinary course of business consistent with past practice;

- 31 -

(xvii)   purchased or acquired any capital stock or other securities of any other corporation or any ownership interest in any other business enterprise or Person;

(xviii)  made capital expenditures or capital additions or betterments in amounts which exceeded $50,000 in the aggregate;

(xix)   changed its method of accounting or its accounting principles or practices, including any policies or practices with respect to the establishment of reserves for work-in-process and accounts receivable, utilized in the preparation of the Financial Statements, other than as required by GAAP;

(xx)   instituted or settled any litigation or any legal, administrative or arbitration action or proceeding before any court or Governmental Body relating to it or any of its properties or assets;

(xxi)   made any settlements or new elections or changed any current elections with respect to its Taxes;

(xxii)  entered into any transaction with any Affiliate not otherwise disclosed in the Seller Disclosure Schedule;

(xxiii)  entered into any agreements, commitments or contracts, except those made in the ordinary course of business consistent with past practice; or

(xxiv)  entered into any agreement or commitment to do any of the foregoing.

4.18   Books and Records. The Books and Records of the Seller with respect to its operations, employees and properties have been maintained in the usual, regular and ordinary manner, all entries with respect thereto have been accurately made, and all transactions involving the Seller have been accurately accounted for, in each case, in all material respects.

4.19   Transactions with Affiliates. Except (a) for employment relationships between the Seller and employees of the Seller, (b) for remuneration by the Seller for services rendered as a director, officer or employee of the Seller, or (c) as set forth in Section 4.19 of the Seller Disclosure Schedule, (i) the Seller does not, in the ordinary course of business or otherwise, directly or indirectly, purchase, lease or otherwise acquire any property or obtain any services from, or sell, lease or otherwise dispose of any property or furnish any services to any Affiliate; (ii) the Seller does not owe any amount of debt to any Affiliate; (iii) no Affiliate owes any amount of debt to the Seller; and (iv) no part of the property or assets of any Affiliate is used by the Seller in the conduct or operation of the Seller's business.

4.20   Customer Relationships. Section 4.20 of the Seller Disclosure Schedule lists the ten (10) largest customers of the Seller (measured by dollar value) for the fiscal years ended December 31, 2004 and 2005. Except as set forth in Section 4.20(a) of the Seller Disclosure Schedule, to the Knowledge of the Seller, there are no facts or circumstances (other than the consummation of the transactions contemplated hereby) that are likely to result in the loss of any one customer or group of customers of the Seller or a material adverse change in the

- 32 -

relationship of the Business with such a customer or group of customers. The Seller generally has a satisfactory relationship with each of its ten (10) largest customers.

4.21    Absence of Certain Business Practices.

(a)    Neither the Seller, nor any of the Seller's directors or officers, nor, to the Knowledge of the Seller, any of the Seller's employees or agents, have directly or indirectly (a) made any contribution or gift which contribution or gift is in violation of any applicable Law, (b) made any bribe, rebate, payoff, influence payment, kickback or other payment to any Person, regardless of form, whether in money, property or services, in violation of any Law or legal requirement, or (c) established or maintained any fund or asset of the Seller that has not been recorded in the books and records of the Seller.

(b)    To the Knowledge of the Seller, the Seller's manufacturing subcontractors have manufactured Seller Products in accordance with all applicable manufacturing/labor laws and regulations, all applicable manufacturing/labor conditions, standards and requirements (including without limitation as to age, working conditions, hours worked and maternity leave) of the retailers carrying such products and in compliance with the policies and standard manufacturing agreement of the Seller as in effect from time to time.

4.22    Brokers and Finders. Except for Fort Dearborn Advisors, LLC, no broker, finder or investment advisor has been engaged by the Seller in connection with the transactions contemplated by this Agreement.

4.23    Restrictions on Business Activities. There is no judgment, injunction, order or decree from a Governmental Body binding upon the Seller or, to the Knowledge of the Seller, threatened, that has or could reasonably be expected to have the effect of prohibiting or impairing the conduct of the business by the Seller as currently conducted.

4.24    Payables. Except as set forth in Section 4.24 of the Seller Disclosure Schedule, all accounts payable of the Seller have arisen in the ordinary course of business. All items which are required by GAAP to be reflected as payables on the Financial Statements and on the books and records of the Seller are so reflected and have been recorded in accordance with GAAP and in a commercially reasonable manner. There has been no material adverse change since December 31, 2005 in the amount or delinquency of accounts payable of the Seller, either individually or in the aggregate.

4.25    Receivables. All Accounts Receivable of the Seller have arisen in the ordinary course of business, represent valid obligations to the Seller arising from bona fide transactions, and, to the Knowledge of the Seller, are not subject to claims, set-off, other defenses or counterclaims or any other facts or circumstances adversely affecting the collectibility thereof. All items which are required by GAAP to be reflected as receivables on the Financial Statements and on the Books and Records of the Seller are so reflected and have been recorded in accordance with GAAP and in a commercially reasonable manner.

4.26    Business Relations. Other than as set forth in Section 4.26 of the Seller Disclosure Schedule, (i) the Seller is not required to provide any bonding or any other financial security arrangements in connection with any transaction with any customer or supplier, (ii)

- 33 -

since December 31, 2004, the Seller has not received any notice of any material disruption (including delayed deliveries or allocations by suppliers) in the availability of any materials or products used in the Seller's business, and (iii) there are no sole source suppliers of goods, equipment or services used by the Seller (other than public utilities) with respect to which practical alternative sources of supply are unavailable.

       4.27    Solvency. As of the Closing Date, after giving effect to the consummation of the transactions contemplated by this Agreement, the Seller will not, by virtue of the consummation of the transactions contemplated by this Agreement or otherwise (and assuming the performance by Purchaser of its obligations hereunder and under the other Transaction Documents), be or be rendered insolvent, as such term is defined under the bankruptcy law (including Title 11 of the United States Code) or the fraudulent conveyances statutes or laws of any of the jurisdictions in which the Seller does business or in which any of its assets are located.

       4.28    Disclaimer of Other Representations and Warranties. Except as expressly set forth in this Agreement and the Transaction Documents to which the Seller is a party, the Seller makes no representation or warranty, express or implied, at law or in equity, in respect of the Seller, its Business or any of its assets, liabilities or operations, including with respect to merchantability or fitness for any particular purpose or with respect to any financial projections furnished by the Seller to the Purchaser prior to the date hereof, and any such other representations or warranties are hereby expressly disclaimed.

## ARTICLE V

### Representations and Warranties of the Purchaser

The Purchaser represents and warrants to the Seller as follows:

       5.1    Organization and Good Standing. The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of New York and has full power and authority to enter into and carry out its obligations under this Agreement and the Transaction Documents to which it is a party.

       5.2    Authorization. The execution and delivery by the Purchaser of this Agreement and the other Transaction Documents to which the Purchaser is a party have been duly authorized by all necessary action required on the part of the Purchaser. This Agreement and the other Transaction Documents to which the Purchaser is a party have been duly executed and delivered by the Purchaser and constitute legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, except as such enforceability may be limited by principles of public policy and applicable bankruptcy, insolvency, moratorium or other laws affecting the rights of creditors generally and by general principles of equity.

       5.3    No Conflicts; Consents. Except as set forth in Section 5.3 of the Purchaser Disclosure Schedule, neither the execution and delivery by the Purchaser of this Agreement or any of the other Transaction Documents to which the Purchaser is a party nor the consummation by the Purchaser of the transactions contemplated hereby or thereby will

- 34 -

(i) conflict with or violate the organizational documents of the Purchaser or (ii) conflict with, violate, result in the breach of any term of, constitute a default under or require the consent or approval of or any notice to or filing with any Person under, any note, mortgage, deed of trust or other agreement or instrument to which the Purchaser is a party or by which the Purchaser is bound, or any Law, writ or injunction of any Governmental Body having jurisdiction over the Purchaser, except with respect to clause (ii) where such conflict, violation, breach or default, or the failure to obtain such consent or approval, give such notice or make such filing, would not materially adversely impair the ability of the Purchaser to consummate the transactions contemplated hereby.

     5.4    Litigation. No lawsuit, governmental investigation or legal, administrative, or arbitration action or proceeding is pending or, to the Knowledge of the Purchaser, threatened against the Purchaser, or any director, officer or employee of the Purchaser in his or her capacity as such, which questions the validity of this Agreement or prohibits or seeks to prohibit, enjoin or otherwise challenge the consummation of the transactions contemplated hereby or any action taken by the Purchaser pursuant to or in connection with this Agreement.

     5.5    Brokers and Finders. No broker, finder or financial advisor has been engaged by the Purchaser in connection with the transactions contemplated by this Agreement.

     5.6    Disclaimer of Other Representations and Warranties. Except as expressly set forth in this Agreement and the Transaction Documents to which the Purchaser is a party, the Purchaser makes no representation or warranty, express or implied, at law or in equity, in respect of the Purchaser and any such other representations or warranties are hereby expressly disclaimed.

## ARTICLE VI

### Certain Covenants

     6.1    Public Announcement. The parties shall consult with each other before issuing any press release or making any written public statement or filing with respect to the Closing of this Agreement and shall not issue any such press release or make any such public statement or filing without the prior consent of the other parties, which shall not be unreasonably withheld; provided, however, that each party may, without the prior consent of the other, issue such press release or make such public statement or filing as may upon the advice of counsel be required by law.

     6.2    Performance of Excluded Liabilities. The Seller shall timely pay or perform, as applicable, all liabilities and obligations that constitute Excluded Liabilities, except for those Excluded Liabilities which are being contested by the Seller in good faith.

     6.3    Conveyance Taxes, etc. All Taxes (other than income or similar Taxes), and all recording, registration, or other fees which become payable in connection with the transactions contemplated hereby shall be paid by the Purchaser. The Purchaser and the Seller

- 35 -

shall cooperate in the preparation, execution and filing of all returns, questionnaires, applications, or other documents regarding any such Taxes or fees.

6.4    Receipt of Property Relating to Purchased Assets. If the Seller or any of its Affiliates, or any other Person acting for or in concert with any of the foregoing Persons, shall receive any money, check, note, draft, instrument, payment or other property relating to or as proceeds of the Purchased Assets or the Assumed Liabilities or any part thereof, each such Person shall receive all such items in trust for, and as the sole and exclusive property of, the Purchaser and, immediately upon receipt thereof, shall notify the Purchaser in writing of such receipt and shall remit the same (or cause the same to be remitted) in kind to the Purchaser in the manner specified by the Purchaser.

6.5    Liability Insurance. The Purchaser shall, at its expense (except to the extent previously paid by the Seller), to the extent such insurance is available, maintain in effect through the first anniversary of the Closing Date the products liability, general liability and employment practices liability and other liability insurance policies covering the Purchased Assets that were in effect immediately prior to the Closing Date. The Purchaser shall be added as an additional insured to each such insurance policy.

6.6    Delivery of Books and Records. The Seller shall arrange, at the Seller's cost, as soon as practicable following the Closing Date, for transportation to the Purchaser of any of the Seller's Books and Records in the possession of the Seller, to the extent not previously delivered in connection with the transactions contemplated hereby, including all agreements, litigation files and filings with Governmental Authorities relating to the Purchased Assets.

6.7    Employee Matters. Purchaser has offered employment commencing on the Closing Date to certain of Seller's employees on terms substantially similar in the aggregate to the terms applicable to such employees immediately prior to the Closing Date, including substantially similar pay, benefit and employment conditions. Notwithstanding the foregoing and except as expressly provided to the contrary in any written agreement between the Purchaser and any such employee, such employees shall be deemed employees at will of Purchaser and Purchaser shall have no obligation, express or implied, to provide continuing employment to any such employee for any specified period after the Closing Date; provided, however, that Purchaser will not terminate the employment of Seller's employees who are offered employment commencing on the Closing Date under circumstances where such termination would trigger liability of Seller under the WARN Act or I-WARN (assuming that (a) Seller does not terminate the employment of its remaining employees earlier than the dates set forth on Schedule B of the Transition Services Agreement and (b) Seller would not have incurred liability under the WARN Act or I-WARN absent such terminations by Purchaser). Upon termination of the Seller's medical insurance plan, the Purchaser will offer COBRA coverage through its insurer to Seller's former employees electing to purchase such coverage.

6.8    Certain Post-Closing Obligations.

(a)    From and after the Closing Date, the Seller shall (i) promptly take such further action and execute and deliver to the Purchaser any additional document or instrument, reasonably requested by the Purchaser, to aid or assist the Purchaser in collecting and reducing to

possession any of the Purchased Assets, to put Purchaser in full operating control of the Business and Purchased Assets, to convey and assign to the Purchaser, and to confirm Purchaser's title to, the Purchased Assets and to otherwise consummate the transactions contemplated hereby, including changing the Seller's name within two (2) days after the Closing Date, (ii) promptly upon receipt, transfer and deliver to the Purchaser any cash or other property that Seller or any Affiliate, may receive after the Closing Date in respect of or arising out of the Purchased Assets, including, without limitation, Accounts Receivable and Inventory, and (iii) promptly after the Closing Date, instruct each bank or other agent which collects receivables included in the Purchased Assets (whether pursuant to a "lockbox" arrangement or otherwise) promptly to forward to the Purchaser all collections in respect of such receivables. The Seller agrees that the Purchaser shall have the right and authority to collect for its own account all receivables and other items which shall be transferred to the Purchaser as provided herein and to endorse with the name of the Seller (or any name under which the Seller may be doing business) any checks and other instruments received on account of any such receivables or other items.

(b)     From and after the Closing Date, the Purchaser shall promptly take such further action and execute and deliver to the Seller any additional document or instrument, reasonably requested by the Seller, in order to confirm the Seller's sale to the Purchaser of the Purchased Assets and the Purchaser's assumption of the Assumed Liabilities. To the extent that the Purchaser receives original Books and Records of the Business at or prior to the Closing, the Purchaser shall make such Books and Records available to the Seller or its representatives for inspection for reasonable business purposes of the Seller, upon reasonable notice during normal business hours during the five (5) year period subsequent to the Closing Date. Notwithstanding the foregoing, if the Purchaser intends, during the such period, to destroy or otherwise dispose of any such Books and Records, it shall not do so until: (i) the Purchaser has notified the Seller of its intention to destroy or dispose of such Books and Records and offered the Seller the opportunity to take possession of such Books and Records, and (ii) (x) the Seller has notified the Purchaser that it does not elect to take possession of such Books and Records or (y) thirty (30) days have elapsed since the Purchaser has given such notice to the Seller without response from the Seller. If the Seller elects to take possession of any such Books and Records pursuant to the immediately preceding sentence, the Purchaser and the Seller shall cooperate in arranging for the shipment thereof to the Seller or in accordance with the Seller's instructions, at the Seller's expense.

6.9     Non-competition.

(a)     Except as shall be expressly permitted in writing by the Purchaser or as contemplated by the Transition Services Agreement, during the Non-Compete Term, the Seller shall not, directly or indirectly, through equity ownership in any entity or otherwise:

(i)     solicit or engage in the design, manufacture, import or sale of children's apparel or accessories in sizes 0 through 24 months (a "Competing Business");

(ii)     solicit the employment of any employee or agent of the Purchaser or of any Affiliate of Purchaser, either on a full or part time or consulting basis;

- 37 -

(iii)    induce or encourage, or cooperate with others in inducing or encouraging, any employee or agent of the Purchaser or of any Affiliate of Purchaser to accept employment, either on a full or part time or consulting basis, with any Competing Business;

(iv)    persuade or influence or seek to persuade or influence any customer of the Purchaser or of any Affiliate of the Purchaser to reduce or discontinue its purchases of any products or services with respect to the Business from the Purchaser or any Affiliate of the Purchaser or divert such purchases with respect to the Business to any person other than the Purchaser or any Affiliate of the Purchaser or cease to do business with respect to the Business or to reduce the amount of business with respect to the Business which such customer has customarily done or contemplates doing with the Purchaser or any Affiliate of Purchaser; or

(v)    interfere in any manner in the relationship, contractual or otherwise, of the Purchaser or of any Affiliate of the Purchaser with any of its suppliers, principals, distributors, lessors or licensors.

(b)    For purposes of this Section 6.9, the terms "customer" and "supplier" of the Purchaser or any Affiliate of Purchaser shall mean and include any individual proprietorship, partnership, corporation, joint venture, trust or other form of business entity which is, at the time of any actual or contemplated prohibited action, or was, at any time during the one-year period immediately preceding any actual or contemplated prohibited action, a customer or supplier, as the case may be, of the Purchaser or of any Affiliate of the Purchaser or which was such a customer or supplier of the Seller at any time during the one-year period immediately preceding the date of this Agreement.

(c)    The Seller shall not use the name "Heyman" in connection with any Competing Business.

(d)    The Seller represents and warrants to the Purchaser, and agrees with the Purchaser, that this Section 6.9 is fair, reasonable and necessary to protect the business, operations, assets, good will and reputation of the Purchaser, and that in making its decision to purchase, acquire and accept the Purchased Assets, the Purchaser relied upon and were induced by the covenants made by the Seller in this Section 6.9.

(e)    The Seller acknowledges that any breach or threatened breach of any obligation set forth in this Section 6.9 shall cause immediate and irreparable harm to the Purchaser which cannot be adequately compensated by money damages. In the event of such a breach or threatened breach, the Purchaser shall, in addition to all other rights or remedies available at law or in equity, be entitled to apply for and receive from any court of competent jurisdiction one or more of a temporary restraining order, preliminary injunction or permanent injunction (without any necessity of proving damages or any requirements for the posting of a bond or other surety) restraining such breach or threatened breach or an order compelling performance of obligations which, if not performed, constitute or would constitute a breach.

(f)    Notwithstanding anything in this Section 6.9, the Seller shall not be considered to be in breach of its covenants hereunder solely on the basis of any investment in

- 38 -

securities of a publicly held corporation that is a Competing Business, provided that any such investment by the Seller shall be passive and that the Seller shall not own or control (as determined in accordance with Section 318 of the Code) 2% or more of the outstanding shares of such corporation.

(g)     For the purposes hereof, the "Non-Compete Term" shall mean the period from and after the Closing Date through the expiration or termination of the covenant in Section 9.2 of the Heyman Employment Agreement.

6.10     Contingent Payment Target.  After the Closing Date, the Purchaser shall use commercially reasonable efforts to promptly sell the Inventory and collect the Accounts Receivable that were reflected on the Balance Sheet and are included in the Purchased Assets, all in the ordinary course of business and without any discount, off-set or rebate, except for such discounts, off-sets or rebates as are consistent with the past business practices of the Seller or as are otherwise authorized by the Seller, in its reasonable discretion.  For a period of one (1) year following the last sale of such Inventory or collection of such Accounts Receivable, the Purchaser shall make its books and records relating to such Inventory and Accounts Receivable available to the Seller or its representatives for inspection, upon reasonable advance notice, during normal business hours.

6.11     Confidential Information.  The Seller shall, and shall cause its Affiliates to, keep in confidence and shall not use, and shall cause its Affiliates not to use, for its or their own benefit or for the benefit of any third parties, or divulge to any third parties, any confidential information, knowledge, data or plans of the Purchaser, including without limitation any confidential information, knowledge, date or plans relating to the Business (collectively, the "Confidential Information"); provided, however, that the Seller and such Affiliates may use Confidential Information as may be reasonably required in connection with the performance of the Seller's obligations under the Transition Services Agreement, the performance of the Seller's obligations under Section 6.8(a) hereof or with the prior written consent of the Purchaser. Confidential Information shall not include information generally available to and known by the public or information that is or becomes available to the Seller or any Affiliate of the Seller on a non-confidential basis, and without a breach of any obligation of confidentiality, from a source other than the Purchaser, any of its Affiliates, or the directors, officers, employees, partners, principals or agents of the Purchaser or any such Affiliate.  Confidential Information shall be considered and kept as the private, proprietary and confidential information of the Purchaser or such Affiliate, as the case may be, and may not be divulged without the express written authorization of the Purchaser.

## ARTICLE VII

### Indemnification

7.1     Survival of Representations, Warranties and Covenants.  The parties to this Agreement hereby agree that the exclusive remedy for any breach of a representation or warranty, covenant or agreement contained in this Agreement shall be the indemnification provisions set out in this Article VII; provided, however, that nothing in this Section 7.1 shall

prohibit any party from seeking specific performance or injunctive relief against any other party in respect of a breach by such other party of any covenant hereunder.

(a)    The representations and warranties of the parties contained in this Agreement, any schedule or any certificate delivered pursuant hereto, shall survive the Closing and shall continue in full force and effect (i) in the case of the representations and warranties of the Seller contained in Sections 4.1, 4.2, 4.5, 4.6(b), 4.14, 4.15, 4.25 and 4.27 until the Maturity Date of the Note (as defined therein), and (ii) in the case of all other representations and warranties of the parties contained in this Agreement, and in any schedule or any certificate delivered pursuant hereto, until eighteen (18) months after the Closing Date. Notwithstanding the foregoing, any representation or warranty in respect of which indemnity may be sought hereunder shall survive the time at which it would otherwise terminate pursuant to this Section 7.1 if notice of the breach thereof shall have been given to the party against whom such indemnity may be sought prior to the expiration of the applicable survival period.

(b)    The parties' covenants and agreements under this Agreement shall survive the Closing indefinitely unless a shorter period of performance is specified with respect to such covenant or agreement.

7.2    Indemnification by the Seller.

(a)    Subject to Sections 7.2(b) and 7.7, the Seller shall indemnify and hold harmless the Purchaser and each of its stockholders, directors, officers, employees, agents and representatives, and the successors and assigns of each of the foregoing (collectively, the "Purchaser Indemnified Parties") from and against any Loss incurred or suffered by any such Person as a result of or arising from, without duplication:

(i)    a breach by the Seller of any representation or warranty made by the Seller in this Agreement, in any Transaction Document to which the Seller is a party or in any schedule or certificate delivered pursuant hereto or thereto;

(ii)    a failure by the Seller to perform or comply with any covenant or agreement on the part of the Seller contained herein or in any Transaction Document to which the Seller is a party;

(iii)    any Excluded Liability of the Seller;

(iv)    the failure of the Seller to comply with any applicable bulk sales laws and the Purchaser's waiver of compliance with such laws;

(v)    all income and similar Taxes arising from or relating to the transactions contemplated hereby; or

(vi)    any amounts drawn by the Landlord under the Vernon Hills Letter of Credit, except amounts drawn on or prior to the 100th day following the expiration date of the Vernon Hills Lease: (A) to cover the cost of repairing damage caused to the Vernon Hills facility after the Closing Date arising out of or relating to the performance of Services under the Transition Services Agreement (as therein defined), which damage is not covered by insurance;

- 40 -

and (B) to cover payments due from the Seller to the Landlord under the Vernon Hills Lease that (1) are included in the definition of Total Costs under the Transition Services Agreement and (2) have not been paid by the Purchaser to the Seller under the Transition Services Agreement as of the date of such drawing.

        (b)    Notwithstanding Section 7.2(a):

        (i)    The Seller shall have no obligation to indemnify the Purchaser Indemnified Parties from and against any Loss under clause (i) of Section 7.2(a) until the Purchaser Indemnified Parties have suffered aggregate Losses, by reason of all such breaches, in excess of one hundred thousand dollars ($100,000) (the "Threshold"); provided that if the aggregate of all such claims for Losses equals or exceeds the Threshold, then the Purchaser Indemnified Parties shall be entitled to recover for Losses subject to the limitations in this Section 7.2(b) only to the extent such Losses exceed the Threshold; and provided further that (A) the Threshold in respect of any Loss or Losses, individually or in the aggregate, as a result of, arising from or in connection with a breach by the Seller of a representation or warranty contained in Section 4.1, 4.2, 4.5, 4.6(b), 4.14, 4.15, 4.25 or 4.27 shall be seventy-five thousand dollars ($75,000); and (B) the maximum amount of Losses against which any Threshold is applied shall not exceed one hundred thousand dollars ($100,000); and

        (ii)    The Seller shall not have any obligation to indemnify the Purchaser Indemnified Parties from and against any Loss under clause (i) of Section 7.2(a) to the extent the aggregate Losses the Indemnified Parties have suffered by reason of all such breaches exceed one million dollars ($1,000,000).

        (c)    Notwithstanding anything to the contrary contained in Section 7.2(b) or anywhere else in this Agreement, Sellers shall indemnify and hold harmless the Purchaser Indemnified Parties, without limitation, from and against any and all Losses incurred or suffered by such Person after the Closing Date as a result of or arising from any fraudulent act or willful or intentional misconduct by the Seller or Heyman prior to the Closing Date.

        7.3    <u>Indemnification by the Purchaser.</u>

        (a)    The Purchaser shall indemnify and hold harmless the Seller, its stockholders, directors, officers, employees, agents and representatives, and the successors and assigns of each of the foregoing (the "Seller Indemnified Parties"), from and against any Loss incurred or suffered by such Person as a result of or arising from:

        (i)    a breach by the Purchaser of any representation or warranty made by the Purchaser in this Agreement, in any Transaction Document to which the Purchaser is a party or in any schedule or certificate delivered pursuant hereto or thereto;

        (ii)    a failure by the Purchaser to perform or comply with any covenant or agreement on the part of the Purchaser contained herein or in any Transaction Document to which the Purchaser is a party; or

        (iii)    any Assumed Liability assumed by the Purchaser pursuant to Section 2.2.

KL2:2428368.11

Notwithstanding anything to the contrary contained in this Agreement, the Purchaser shall indemnify and hold harmless the Seller Indemnified Parties from and against any Loss incurred or suffered by the Seller Indemnified Parties after the Closing Date as a result of or arising from any fraudulent act or willful or intentional misconduct by the Purchaser or Wear Me.

7.4    Assumption of Defense. An indemnified party shall promptly give notice to each indemnifying party after obtaining knowledge of any matter as to which recovery may be sought against such indemnifying party because of the indemnity set forth above, and, if such indemnity shall arise from the claim of a third party, shall permit such indemnifying party to assume the defense of any such claim or any proceeding resulting from such claim; provided, however, that failure to give any such notice promptly shall not affect the indemnification provided under this Article VII, except to the extent such indemnifying party shall have been actually prejudiced as a result of such failure. Any notice of a claim shall state specifically the representation, warranty, covenant or agreement giving rise to such claim for indemnity. Notwithstanding the foregoing, an indemnifying party may not assume the defense of any such third-party claim if it does not demonstrate to the reasonable satisfaction of the indemnified party that it has adequate financial resources to defend such claim and pay any and all Losses that may result therefrom, or if the claim (i) is reasonably likely to result in imprisonment of the indemnified party, (ii) is reasonably likely to result in an equitable remedy which would materially impair the indemnified party's ability to exercise its rights under this Agreement, or impair the Purchaser's right or ability to operate the Business, or (iii) names both the indemnifying party and the indemnified party (including impleaded parties) and representation of both parties by the same counsel would create a conflict. If an indemnifying party assumes the defense of such third party claim, such indemnifying party shall agree prior thereto, in writing, that it is liable under this Article VII to indemnify the indemnified party in accordance with the terms contained herein in respect of such claim, shall conduct such defense diligently, shall have full and complete control over the conduct of such proceeding on behalf of the indemnified party and shall, subject to the provisions of this Section 7.4, have the right to decide all matters of procedure, strategy, substance and settlement relating to such proceeding; provided, however, that any counsel chosen by such indemnifying party to conduct such defense shall be reasonably satisfactory to the indemnified party, and the indemnifying party will not without the written consent of the indemnified party consent to the entry of any judgment or enter into any settlement with respect to the matter which does not include a provision whereby the plaintiff or the claimant in the matter releases the indemnified party from all liability with respect thereto or which may be reasonably be expected to have an adverse effect on the indemnified party. The indemnified party may participate in, but may not control, such proceeding and retain separate co-counsel at its sole cost and expense. Failure by an indemnifying party to notify the indemnified party of its election to defend any such claim or proceeding by a third party within thirty (30) days after notice thereof shall be deemed a waiver by such indemnifying party of its right to defend such claim or action.

7.5    Non-Assumption of Defense. If no indemnifying party is permitted or elects to assume the defense of any such claim by a third party or proceeding resulting therefrom, the indemnified party shall diligently defend against such claim or litigation in such manner as it may deem appropriate and, in such event, the indemnifying party or parties shall promptly reimburse the indemnified party for all reasonable out-of-pocket costs and expenses, legal or

- 42 -

otherwise, incurred by the indemnified party and its affiliates in connection with the defense against such claim or proceeding, as such costs and expenses are incurred. Any counsel chosen by such indemnified party to conduct such defense must be reasonably satisfactory to the indemnifying party or parties, and only one counsel shall be retained to represent all indemnified parties in an action (except that if litigation is pending in more than one jurisdiction with respect to an action, one such counsel may be retained in each jurisdiction in which such litigation is pending). The indemnified party shall not settle or compromise any such claim without the written consent of the indemnifying party, which consent shall not be unreasonably withheld.

7.6    Indemnified Party's Cooperation as to Proceedings. The indemnified party will cooperate in all reasonable respects with any indemnifying party in the conduct of any proceeding as to which such indemnifying party assumes the defense. For the cooperation of the indemnified party pursuant to this Section 7.6, the indemnifying party or parties shall promptly reimburse the indemnified party for all reasonable out-of-pocket costs and expenses, legal or otherwise, incurred by the indemnified party or its affiliates in connection therewith, as such costs and expenses are incurred.

7.7    Payments Treated as Purchase Price Adjustment. Any payment by the Purchaser or the Seller under this Article VII will be treated for Tax purposes as an adjustment to the consideration hereunder for the Purchased Assets.

7.8    Limitations on Indemnity. In calculating the amount of any Losses payable to an indemnified party hereunder, the amount of the Losses: (i) shall not be duplicative of any other Loss for which an indemnification claim has been made, (ii) shall be computed net of any amounts actually recovered by such indemnified party under any insurance policy with respect to such Losses (net of any costs and expenses incurred in obtaining such insurance proceeds); (iii) shall be increased by any Tax incurred as a result of or related to any such Loss, including any Tax related to the inclusion in gross income of insurance proceeds or an indemnification payment; and (iv) shall be reduced by any Tax benefit realized as a result of or related to any such Loss. If the indemnifying parties pay the indemnified parties for a claim and subsequently insurance proceeds in respect of such claim are collected by the indemnified parties, then the indemnified parties promptly shall remit the insurance proceeds (net of any costs and expenses incurred in obtaining such insurance proceeds) to the Seller or to the Purchaser, as applicable.

## ARTICLE VIII

### Miscellaneous

8.1    Expenses. Except as otherwise expressly set forth herein, each party hereto shall pay all costs and expenses incurred by such party in respect of the transactions contemplated hereby.

8.2    Entirety of Agreement. This Agreement (including the Seller Disclosure Schedule, the Purchaser Disclosure Schedule and all other schedules and exhibits hereto), together with the other Transaction Documents and certificates and other instruments delivered

- 43 -

KL2:2428368.11

hereunder and thereunder, state the entire agreement of the parties, merge all prior negotiations, agreements and understandings, if any, and state in full all representations, warranties, covenants and agreements which have induced this Agreement. Each party agrees that in dealing with third parties no contrary representations will be made.

8.3    Notices. All notices, demands and communications of any kind which any party hereto may be required or desire to serve upon another party under the terms of this Agreement shall be in writing and shall be given by: (a) personal service upon such other party; (b) mailing a copy thereof by certified or registered mail, postage prepaid, with return receipt requested; (c) sending a copy thereof by Federal Express or equivalent courier service; or (d) sending a copy thereof by facsimile, in each case to the parties at the respective addresses and facsimile numbers set forth on the signature pages hereto.

In case of service by Federal Express or equivalent courier service or by facsimile or by personal service, such service shall be deemed complete upon delivery or transmission, as applicable. In the case of service by mail, such service shall be deemed complete on the fifth Business Day after mailing. The addresses and facsimile numbers to which, and persons to whose attention, notices and demands shall be delivered or sent may be changed from time to time by notice served as hereinabove provided by any party upon any other party.

8.4    Amendment. This Agreement may be modified or amended only by an instrument in writing, duly executed by all of the parties hereto.

8.5    Waiver. No waiver by any party of any term, provision, condition, covenant, agreement, representation or warranty contained in this Agreement (or any breach thereof) shall be effective unless it is in writing executed by the party against which such waiver is to be enforced. No waiver shall be deemed or construed as a further or continuing waiver of any such term, provision, condition, covenant, agreement, representation or warranty (or breach thereof) on any other occasion or as a waiver of any other term, provision, condition, covenant, agreement, representation or warranty (or of the breach of any other term, provision, condition, covenant, agreement, representation or warranty) contained in this Agreement on the same or any other occasion.

8.6    Counterparts; Facsimile. For the convenience of the parties, any number of counterparts hereof may be executed, each such executed counterpart shall be deemed an original and all such counterparts together shall constitute one and the same instrument. Facsimile transmission of any signed original counterpart and/or retransmission of any signed facsimile transmission shall be deemed the same as the delivery of an original.

8.7    Assignment; Binding Nature; No Beneficiaries. This Agreement may not be assigned by any party hereto without the written consent of the Purchaser and the Seller; provided, however, that the Purchaser may assign its rights hereunder: (a) to any Affiliate of the Purchaser which assumes the obligations of the Purchaser hereunder, as the case may be, but no such assignment shall relieve the Purchaser of any such obligations; or (b) to the purchaser in connection with any acquisition of the Purchaser's business, whether by purchase of equity, assets or by merger or similar transaction. Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their

respective successors and permitted assigns. Except as otherwise expressly provided in Article VII with respect to Purchaser Indemnified Parties and Seller Indemnified Parties, respectively, this Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

        8.8     <u>Headings</u>.  The headings in this Agreement are inserted for convenience only and shall not constitute a part hereof.

        8.9     <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York including, without limitation, Section 5-1401 of the New York General Obligations Law.  Subject to the provisions of Section 8.15 hereof, the parties hereby irrevocably consent to the exclusive jurisdiction of the United States District Court for the Northern District of Illinois without regard to principles of conflicts of law and hereby irrevocably waive any claim they may have that any proceedings brought in such courts have been brought in an inconvenient forum.  The parties waive personal service of process and consents to service of process by certified or registered mail, return receipt requested, directed to it at the address last specified for notices hereunder, and such service shall be deemed completed ten (10) calendar days after the same is so mailed.

        8.10    <u>Construction; Disclosure Schedules</u>.

        (a)     In this Agreement (i) words denoting the singular include the plural and vice versa, (ii) "it" or "its" or words denoting any gender include all genders, (iii) the word "including" shall mean "including without limitation," whether or not expressed, (iv) any reference to a statute shall mean the statute and any regulations thereunder in force as of the date of this Agreement or the Closing Date, as applicable, unless otherwise expressly provided, (v) any reference herein to a Section, Article, Schedule or Exhibit refers to a Section or Article of or a Schedule or Exhibit to this Agreement or the Seller or Purchaser Disclosure Schedule, as applicable, unless otherwise stated, and (vi) when calculating the period of time within or following which any act is to be done or steps taken, the date which is the reference day in calculating such period shall be excluded and if the last day of such period is not a Business Day, then the period shall end on the next day which is a Business Day.

        (b)     The disclosures in the parties' respective Disclosure Schedules must relate only to the representations and warranties in the Section of the Agreement to which they expressly relate and not to any other representation or warranty in this Agreement, except to the extent that the relevance to such other representation and warranty is manifest on the face of the Disclosure Schedule.  In the event of any inconsistency between the statements in the body of this Agreement and those in a Party's Disclosure Schedule (other than an exception expressly set forth as such in such Disclosure Schedule with respect to a specifically identified representation or warranty or any other representation or warranty as to which the relevance of such disclosure is manifest on the face of such Disclosure Schedule) the statements in the body of this Agreement will control.

        8.11    <u>Negotiated Agreement</u>.  The parties acknowledge that they have been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and the Transaction Documents and accordingly agree that if an ambiguity exists with respect to

- 45 -

KL2:2428368.11

any provision of this Agreement or the Transaction Documents, such provision shall not be construed against any party because such party or its representatives drafted such provision.

8.12    Remedies Cumulative.  Except as otherwise expressly provided herein, the remedies provided for or permitted by this Agreement shall be cumulative and the exercise by any party of any remedy provided for herein shall not preclude the assertion or exercise by such party of any other right or remedy provided for herein.

8.13    Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

8.14    Right of Set-Off.

(a)    Notwithstanding any provision of this Agreement to the contrary, the parties hereby acknowledge and agree that, in addition to any other right hereunder, the Purchaser shall have the right, but not the obligation, from time to time to set off against any principal payment due under the Note any amounts claimed in good faith by the Purchaser to be owed by the Seller to Purchaser or any Purchaser Indemnified Party under this Agreement. The Purchaser shall have no right of set off against interest payments due under the Note and interest under the Note shall continue to be payable in accordance with the terms of the Note notwithstanding the set-off rights set forth in this Section 8.14.

(b)    If the Purchaser elects to exercise its set-off rights hereunder, it shall give the Seller, Heyman and the Escrow Agent written notice of such election (a "Set-Off Notice"), which Set-Off Notice shall include the amount to be set-off (or, if such amount cannot be precisely determined on the date a Set-Off Notice is given, then Purchaser's estimate of such amount) and a description in reasonable detail of the circumstances giving rise to the Purchaser's entitlement to such set-off. If, in the good faith judgment of the Purchaser, the amount to be set-off, or Purchaser's estimate of the amount to be set-off, in respect of any set-off claim has increased or decreased from the amount set forth in Purchaser's original Set-Off Notice, the Purchaser shall deliver to Seller, Heyman and the Escrow Agent an amended notice (the "Amended Set-Off Notice") as promptly as practicable. The Seller and Heyman shall have ten (10) days after receipt of such Set-Off Notice to review such Set-Off Notice or Amended Notice (the "Set-Off Review Period"), and in the event that the Seller or Heyman has any objections or challenges to the exercise of the set-off right of the Purchaser, the Seller and Heyman shall submit a single written notice of set-off dispute ("Notice of Set-Off Dispute") to the Purchaser and the Escrow Agent during such Set-Off Review Period, specifying in reasonable detail the nature of any asserted objections or challenges. In the event of any such dispute, the Seller, the Purchaser and Heyman shall negotiate in good faith to resolve such dispute for thirty (30) days after receipt by the Purchaser of the Notice of Set-Off Dispute. If the Seller, the Purchaser and Heyman are unable to resolve such dispute within such 30-day period, such dispute shall be submitted to arbitration pursuant to Section 8.15 hereof.

(c)    Anything in this Agreement or in the Note to the contrary notwithstanding:

KL2:2428368.11

(i)      any principal payments required to be made by the Purchaser under the Note from the date of a Set-Off Notice through and including the date on which the parties have agreed upon the amount, if any, of the set-off to which the Purchaser is entitled or, if the parties cannot so agree, such dispute is finally settled by arbitration pursuant to Section 8.15 hereof (up to the aggregate amount set forth in the Set-Off Notice, as amended by any Amended Notice ) shall be deposited into escrow with the Escrow Agent and released to the parties pursuant to the terms and conditions of the Escrow Agreement;

(ii)      in the case of any set-off by the Purchaser pursuant to this Section 8.14, the obligation of the Seller shall be deemed satisfied and discharged to the extent of such set-off;

(iii)      the exercise of the right of set-off by the Purchaser in good faith, whether or not finally determined to be justified, will not constitute a breach or default under this Agreement or the Note;

(iv)      the exercise of the Purchaser's right of set-off with respect to, or the deposit into escrow, in good faith, pursuant to this Section 8.14 and the Escrow Agreement, of all or any portion of the amount due in respect of any principal payment under the Note shall be the equivalent of paying such amount of principal on the date of such deposit to the holder of the Note for all purposes of this Agreement and the Note (and, accordingly, the principal amount of the Note shall be reduced by the amount of such payment and no further interest shall accrue under the Note with respect to the amount of principal so paid).

8.15      Arbitration.

(a)      Except as otherwise specifically provided for herein with respect to the availability of equitable remedies and notwithstanding any provision of this Agreement, the Note, the Escrow Agreement or any other Transaction Document to the contrary, any controversy, claim or dispute arising under or relating to Section 8.14 hereof (a "Section 8.14 Dispute"), or any other Section of this Agreement, the Note, the Escrow Agreement or any other Transaction Document that relates to or is implicated by a Section 8.14 Dispute, shall, if not settled by the procedures set forth in Section 8.14(b), be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA"), as supplemented herein, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

(b)      There shall be three arbitrators, including at least one practicing attorney and one certified public accountant. Pending final award, arbitrator compensation and expenses shall be advanced equally by both parties. The arbitration shall take place in Chicago, Illinois.

(c)      The AAA shall hold an administrative conference with counsel for the parties within 20 days after the filing of the demand for arbitration. The parties and the AAA shall thereafter cooperate in order to complete the appointment of three arbitrators as quickly as possible. Within 15 days after all three arbitrators have been appointed, an initial meeting among the arbitrators and counsel for the parties shall be held for the purpose of establishing a plan for administration of the arbitration, including:

(i)    definition of issues;

(ii)    scope, timing and types of discovery, which may at the discretion of the arbitrators include production of documents in the possession of the parties, but may not without consent of all parties include depositions;

(iii)    exchange of documents and filing of detailed statements of claim and pre-hearing memoranda;

(iv)    schedule and place(s) of hearings; and

(v)    any other matters that may promote the efficient, expeditious and cost-effective conduct of the proceeding.

(d)    The final award shall include pre-award interest at a rate of interest determined by the arbitrators to approximate the cost to the prevailing party of borrowing money during the relevant period. The final award may grant such other, further and different relief as authorized by the Commercial Arbitration Rules of the AAA.

(e)    The parties consent to the exclusive jurisdiction of the United States District Court for the Northern District of Illinois for all purposes in connection with arbitration, including the entry of judgment on any award; and consent that any process, notice of motion or other application to either of said courts, and any papers in connection with arbitration, may be served by registered or certified mail, return receipt requested, by personal service, on in such other manner as may be permissible under the rules of the applicable court or arbitration tribunal, provided a reasonable time for appearance is allowed.

8.16    No Joint Venture. Nothing contained in this Agreement shall be deemed or construed to create any partnership, joint venture or other relationship between the Seller and the Purchaser (other than the relationship of seller and purchaser).

8.17    **WAIVER OF JURY TRIAL. EACH PARTY HERETO WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR ANY OF THE TRANSACTION DOCUMENTS.**

8.18    Bulk Transfer Laws. Notwithstanding anything in this Agreement to the contrary, the Purchaser acknowledges that the Seller will not comply with the provisions of any bulk transfer laws of any jurisdiction (other than the State of Illinois) in connection with the transactions contemplated by this Agreement and will indemnify the Purchaser and the Purchaser Indemnified Parties for any Loss incurred by them with respect to such failure to comply, or in connection with any inaccuracy or inadequacy in the filings made by the Seller under the Illinois bulk transfer laws, in accordance with the provisions of Section 7.2(a) hereof.

**[Signature pages follow]**

KL2:2428368.11

**IN WITNESS WHEREOF,** the parties hereto have duly executed and delivered this Agreement as of the date first set forth above.

## THE PURCHASER:

Address:                                          **WEAR ME APPAREL CORP.**
Wear Me Apparel Corp.
31 W. 34th Street
New York, New York  10001
Attention:                                        By: _____
Facsimile No.:                                        Name: **JASON RABIN**
                                                      Title: **PRESIDENT**


With copies to:
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York  10036
Attention:  Howard J. Rothman, Esq.
            Bonnie D. Podolsky, Esq.
Facsimile No.: (212) 715-9520

Address:

c/o Lawrence S. Heyman
414 Washington Avenue
Glencoe, Illinois  60022

With copies to:
Arnstein & Lehr LLP
120 S. Riverside Plaza, Suite 1200
Chicago, Illinois  60606-3910
Attention:  Robert I. Ury, Esq.
            Cynde H. Munzer, Esq.
Facsimile No.:  312-772-2345

**THE SELLER**

**HEYMAN CORPORATION**


By: _____
    Name:  Lawrence S. Heyman
    Title:  President and Chief Executive Officer

KL2:2428368.11

## Asset Purchase Agreement

*Exhibits*

| | |
|---|---|
| Exhibit A | Heyman Employment Agreement |
| Exhibit B | Escrow Agreement |
| Exhibit C | Transition Services Agreement |
| Exhibit D | Notes |
| Exhibit E | Assignment and Assumption Agreements |
| Exhibit F | Bill of Sale |
| Exhibit G | Liabilities Undertaking |
| Exhibit H | Trademark Assignment Agreement |
| Exhibit I | Domain Name Assignment Agreement |

*Schedules*

| | |
|---|---|
| Schedule A | Assumed Payables |
| Schedule B | Excluded Assets |

*Seller Disclosure Schedule*

*Purchaser Disclosure Schedule*

KL2:2428368.11