UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

SAMMART FASHION CO. LTD.,                          :
                                                   :
                              Plaintiff,           :      07 CV 4035 (DAB)
                                                   :
              - against -                          :
                                                   :
WEAR ME APPAREL CORP. d/b/a KIDS                   :
HEADQUARTERS and HEYMAN                            :
CORPORATION,                                       :
                                                   :
                              Defendants.          :

——————————————————— x

## REPLY DECLARATION OF BONNIE PODOLSKY

I, Bonnie Podolsky, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a member of the bar of the State of New York and am a member of the law firm of Kramer Levin Naftalis & Frankel LLP, attorneys for defendant Wear Me Apparel LLC d/b/a Kids Headquarters, as successor by merger to Wear Me Apparel Corp. d/b/a Kids Headquarters, ("Wear Me"). I respectfully submit this reply declaration in further support of Wear Me's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

2.      Annexed as Exhibit A hereto is a true and correct copy of a letter and attachments that I sent to Mitchell Malzberg, Esq., counsel for Sammart, on or about July 9, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 12, 2007
       New York, New York

Bonnie Podolsky

KL3 2617615.1

# EXHIBIT
# A

# KRAMER LEVIN NAFTALIS & FRANKEL LLP

BONNIE D. PODOLSKY
PARTNER
PHONE 212-715-7663
FAX 212-715-8024
BPODOLSKY@KRAMERLEVIN.COM

July 9, 2007

**VIA FEDERAL EXPRESS**
Mitchell Malzberg, Esq.
Mitnick & Malzberg, P.C.
29 Race Street
Frenchtown, New Jersey 08825

Dear Mr. Malzberg:

Eric Gul of Wear Me Apparel LLC ("WMA") has forwarded to me your letter dated June 22, 2007 regarding Sammart Fashion Co. Ltd.

As Mr. Gul has previously explained to you, WMA acquired substantially all of the assets, and acquired certain liabilities, of Heyman Corporation ("Heyman") in April 2006. The Asset Purchase Agreement, dated as of April 7, 2006 (the "Asset Purchase Agreement"), between Wear Me Apparel Corp., the predecessor of WMA, and Heyman, provides for the assumption by WMA of certain discreet liabilities of Heyman (Section 2.2). As defined in Article I of the Asset Purchase Agreement, "Assumed Liabilities" consist of several categories of liabilities, including "Assumed Payables." Assumed Payables consist of Heyman's accounts payable and other current liabilities incurred in the ordinary course of business, as of April 7, 2006, but only to the extent that such accounts payable and current liabilities are listed on Schedule A to the Asset Purchase Agreement. The Asset Purchase Agreement also provides that, except for the Assumed Liabilities, neither WMA nor any of its affiliates shall assume or be deemed to assume any liabilities or obligations of Heyman, "all of which shall remain the sole and exclusive responsibilities of the Seller [Heyman]." [emphasis added]. Schedule A to the Asset Purchase Agreement includes a listing for accounts payable to Sammart in the amount of $7,124.20. Heyman provided the back-up for the $7,124.20 figure in Subschedule iB to Schedule A.

In Section 4.8(b) of Heyman's Disclosure Schedules (relating to potential breaches of contract), Heyman disclosed Sammart's claim that Heyman owed it $220,506.37. However, WMA did not assume any liability in respect of this claim. The only liabilities under Heyman's contracts that WMA assumed were obligations and liabilities under specified contracts accruing from and after the Closing Date [emphasis added]."

Copies of all of the relevant sections of the Asset Purchase Agreement and the related schedules are attached to this letter for your review.

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

Mitchell Malzberg, Esq.
July 9, 2007
Page 2


      Accordingly, the portion of Heyman's obligation to Sammart that WMA assumed under the Asset Purchase Agreement is limited to $7,124.20. Heyman Corporation is responsible for any balance in excess of this amount. We suggest that your client contact them to recover any amounts that it may be owed in excess of $7,124.20.

      If you have any questions regarding the Asset Purchase Agreement, please feel free to call me.

                     Sincerely yours,

                     Bonnie D. Podolsky


cc:    Eric Gul, Esq.
       Jonathan Wagner, Esq.

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of April 7, 2006, is by and between Wear Me Apparel Corp., a New York corporation (the "Purchaser"), and Heyman Corporation, a Delaware corporation (the "Seller").

### RECITALS

WHEREAS, Seller is engaged in the business of selling licensed branded and private label infant and toddler apparel and accessories, with a specific focus on the newborn to twenty-four month category, to mass merchandisers, department stores and other retailers located throughout the United States (the "Business");

WHEREAS, the Purchaser desires to acquire from Seller, and Seller desires to sell, transfer and assign to Purchaser, all of the assets of and relating to the Business (other than Excluded Assets, as hereinafter defined).

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE I

### Certain Definitions

"AAA" has the meaning set forth in Section 10.15.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Person. For purposes of this definition, "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Assigned Contracts" means each of the contracts, leases, commitments, instruments and other agreements included in the Purchased Assets. Assigned Contracts shall not include any contract, lease, commitment, instrument or other agreement that is an Excluded Asset.

"Assignment and Assumption Agreement" has the meaning set forth in Section 3.2(a).

"Assumed Contract Liabilities" means the obligations and liabilities of Seller under or related to the Continuing Licenses and other Assigned Contracts that accrue from and after the Closing Date (it being understood that, as between the Purchaser and the Seller, the Purchaser is not assuming any liability under any Continuing License or other Assigned Contract

that accrued prior to the Closing Date, notwithstanding any provision in any Assignment and Assumption Agreement to the contrary).

"Assumed Liabilities" means: (a) the Assumed Payables, (b) the Assumed Contract Liabilities, (c) the Transaction Costs and (d) the Letter of Credit Liabilities.

"Assumed Payables" means (without duplication of any liability or other obligation otherwise included in the definition of Assumed Liabilities) the Seller's accounts payable and other current liabilities incurred in the ordinary course of business as of the Closing Date, provided that such accounts payable and other current liabilities: (a) would be recorded as such on a balance sheet of the Seller as of the Closing Date prepared in accordance with GAAP; and (b) are listed on Schedule A hereto; provided, however, that Assumed Payables shall not include any Excluded Liabilities.

"Balance Sheet" means the unaudited balance sheet of the Seller as of December 31, 2005.

"Bank" means JPMorgan Chase Bank, N.A. (or its successors or assigns).

"Bill of Sale" has the meaning set forth in Section 3.2(a).

"Business Day" means any day that is not a Saturday or Sunday or a legal holiday on which banks are authorized or required by law to be closed in New York, New York.

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"COBRA" has the meaning set forth in Section 4.14(b).

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Contingent Payment Target" means the realization from the net proceeds of the sale of the Inventory and the collection of the Accounts Receivable, in each case as reflected on the Balance Sheet, of an aggregate amount in excess of $15,530,000, which amount represents 90% of the sum of: (i) the Seller's gross trade Accounts Receivable as of December 31, 2005 (without deduction for any reserve reflected on the Seller's books is respect thereof); plus (ii) the Seller's Inventory as of December 31, 2005, valued at cost, net of a reserve of $423,000.

"Continuing Licenses" means all of the Licenses other than those listed as Excluded Assets on Schedule B hereto.

"Contracts" has the meaning set forth in Section 4.8(a).

"Employee Benefit Plan" has the meaning set forth in Section 4.15(a).

"Employment Agreement" means the employment agreement of even date herewith between the Purchaser and Heyman, in the form attached hereto as Exhibit A.

- 2 -

2006, to the extent such fees or expenses were not reflected on the Balance Sheet, the aggregate amount of such Transaction Costs pursuant to this clause (a) to be limited in amount to the amount by which $750,000 exceeds the amount of any Transaction Costs of the type described in this clause (a) paid by the Seller prior to the Closing, except for payments to Fort Dearborn Advisors, LLC of up to $40,000; and (b) the amounts payable to the licensors under the Continuing Licenses in connection with the assignment to the Purchaser hereunder.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreements, the Bill of Sale, the Trademark Assignment Agreement, the Domain Name Assignment Agreement, the Liabilities Undertaking, the Employment Agreements, the Escrow Agreement, the Transition Services Agreement and, if issuable pursuant to Section 2.7 hereof, the Note.

"Transition Services Agreement" means the Transition Services Agreement of even date herewith between the Purchaser and the Seller in the form attached hereto as <u>Exhibit D.</u>

"2006 Adjusted Gross Revenues" has the meaning set forth in Section 2.7.

"U.S." means the United States of America.

"Vernon Hills Letter of Credit" means the standby letter of credit in the maximum amount of $288,000 issued under the Vernon Hills Lease by the Bank in favor of the Landlord, as beneficiary.

"Vernon Hills Lease" means that certain lease between the Seller and the Landlord, dated as of September 24, 1997, as amended, for the land, parking areas and building located at 375 North Fairway Drive, Vernon Hills, Illinois.

"WARN Act" means the U.S. Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2101 et seq., as amended from time to time.

## ARTICLE II

### Purchase and Sale

2.1     <u>Purchase and Sale of Assets</u>.  Subject to and upon the terms and conditions hereinafter set forth, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase from Seller, the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

2.2     <u>Assumption of Liabilities</u>.  (a)  Subject to and upon the terms and conditions hereinafter set forth, at the Closing, Purchaser shall assume and pay, perform and discharge when due, the Assumed Liabilities, and no others.  In the event of any claim against the Purchaser with respect to any of the Assumed Liabilities hereunder, Purchaser shall have, and the Seller hereby assigns to the Purchaser, any defense, counterclaim, or right of setoff that would have been available to the Seller if such claim had been asserted against the Seller. Nothing contained herein shall require the Purchaser to pay or discharge any debts or obligations

expressly assumed hereby so long as Purchaser shall in good faith contest or cause to be contested the amount or validity thereof.

(b)     Except for the Assumed Liabilities, neither the Purchaser nor any Affiliate of the Purchaser shall assume or be deemed to assume any liabilities or obligations of the Seller or the Business, all of which shall remain the sole and exclusive responsibility of the Seller. All such liabilities and obligations (other than the Assumed Liabilities) are referred to herein as the "Excluded Liabilities." Without limiting the generality of the foregoing, "Excluded Liabilities" includes:

(i)     any liability or obligation of the Seller in respect of any pending litigation, including the matters set forth in Section 4.10(a) of the Seller Disclosure Schedule;

(ii)     any third party claim or other obligation that is not an Assumed Liability and that arises out of or relates to the operation by the Seller of the Business prior to the Closing Date, whether such claim is first asserted prior or subsequent to the Closing Date, including the matters set forth in Section 4.10(b) of the Seller Disclosure Schedule;

(iii)     any obligation or liability whatsoever as to any employee or former employee of Seller with respect to any matter arising from his or her employment by Seller or arising in connection with any termination of such employee by Seller, including unpaid compensation, pension, retirement, accrued vacation, severance, employee welfare or other benefits, collective state or local law designed to protect employees, including equal employment laws, wrongful discharge laws, the WARN Act, I-WARN, or other rights, whether a claim with respect thereto is first asserted prior or subsequent to the Closing Date;

(iv)     with respect to any employee of Seller who accepts employment by Purchaser subsequent to the Closing, any obligation or liability to such Employee arising out of any facts or circumstances, or any condition of employment, that existed during the course of such Employee's employment with Seller and continued during the course of such Employee's employment with Purchaser;

(v)     any liability or obligation in respect of the Vernon Hills Lease or any other Excluded Asset, including without limitation any cost of removing Heyman's personal assets listed on Schedule B from the Vernon Hills facility or for the repair of any damage caused by such removal;

(vi)     any liability in respect of the Hong Kong Subsidiary; or

(vii)     except for those Taxes that are Assumed Payables and, as such, are set forth on Schedule A hereto, the aggregate amount of which does not exceed the amount set forth on said Schedule with respect thereto, all Taxes of the Seller relating to periods ending on or prior to the Closing Date and all periods beginning prior to the Closing Date and ending after the Closing Date, to the extent attributable to the period through and including the Closing Date.

2.3     Purchase Price. In consideration of the aforesaid sale, assignment, transfer, conveyance and delivery of the Purchased Assets, the Purchaser shall: (a) pay to the Seller the sum of $14,224.462.00 at the Closing, such amount to be paid by wire transfer of

KL2:2423368.11

(xi)     each mortgage agreement, deed of trust, security agreement, purchase money agreement, conditional sales contract or capital lease of an amount or value in excess of $25,000 annually;

(xii)     each partnership, joint venture agreement or similar agreement providing for the joint performance of work or services;

(xiii)     each agreement or commitment that requires the Seller to make unpaid capital expenditures in excess of $50,000;

(xiv)     each agreement containing a change of control provision;

(xv)     each manufacturing, distribution or sourcing agreement or arrangement;

(xvi)     each agreement or other arrangement pursuant to which the Seller is obligated to accept returned merchandise or grant credit for unsold merchandise in excess of $10,000, other than as set forth in standard form, non-negotiated purchase orders or confirmations;

(xvii)     each agreement or other arrangement providing for the development of software for, or license of software (other than off-the-shelf, shrink-wrap, or click-through software applications) or Intellectual Property Rights to, the Seller, which software or Intellectual Property Rights are used or incorporated in any of the Seller Products, including rights of publicity;

(xviii)     each material agreement with respect to any Seller IP Rights;

(xix)     each agreement or arrangement with respect to advertising (including co-op advertising) or any concept shops or in-store sales environments (i.e. shop in shops) for any Seller Product;

(xx)     each agreement that obligates the Seller to indemnify a third party; and

(xxi)     each other agreement (or group of agreements) having an indefinite term or a fixed term of more than one (1) year (other than those that are terminable upon not more than thirty (30) days' notice by the Seller without penalty) or requiring payments by the Seller in excess of $50,000 per year or the loss of which could reasonably be expected to have, directly or indirectly, individually or in the aggregate, a Material Adverse Effect.

Complete copies of all written (and summaries of all oral) Contracts required to be disclosed pursuant to this Section 4.8(a) have been made available to the Purchaser or its representatives.

(b)     Except as set forth in Section 4.8(b) of the Seller Disclosure Schedule, each of the Contracts that does not expire in accordance with its terms is in full force and effect and is enforceable by the Seller in accordance with its respective terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium and other similar laws

KL2:2428368.11

affecting creditors' rights generally and by general principles of equity. Except as set forth in Section 4.8(b) of the Seller Disclosure Schedule, the Seller is not (with or without the lapse of time or the giving of notice, or both) in breach of or in default under any of the Contracts, and, to the Knowledge of the Seller, no other party to any of the Contracts is (with or without the lapse of time or the giving of notice, or both) in breach of or in default under any of the Contracts.

4.9    Insurance. All material insurance policies currently maintained by the Seller, or under which the Seller is insured, are listed in Section 4.9 of the Seller Disclosure Schedule. All such insurance policies are with reputable insurance carriers and provide coverage appropriate in character and amount for the businesses of Seller and its properties and assets. Except as set forth in Section 4.9 of the Seller Disclosure Schedule, there are no material pending claims with respect to the Seller or its properties or assets under any such insurance policy. The Seller has not received written notice of cancellation or non-renewal of any such policy. The key man life insurance policy issued by Sun Life Financial Insurance Company owned by the Seller insuring Heyman lapsed in January 2006. Such policy was a term policy and had no cash surrender value. The Seller does not own any other policy insuring Heyman's life.

4.10    Litigation.

(a)    Except as set forth in Section 4.10(a) of the Seller Disclosure Schedule, and except with respect to environmental matters (which are addressed in Section 4.15 of this Agreement), there is no lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding pending or, to the Knowledge of the Seller, threatened against the Seller or any of its properties or assets, or any director, officer or, to the Knowledge of the Seller, employee of the Seller, in his or her capacity as such, and the Seller is not identified as a party subject to any restrictions or limitations under any judgment, order or decree of any Governmental Body.

(b)    Except as set forth in Section 4.10(b) of the Seller Disclosure Schedule, there are no existing claims against the Seller for goods which are defective or fail to meet any product warranties or contract, customer or industry standards.

4.11    Condition and Sufficiency of Assets. The properties and assets owned, leased, operated and used by the Seller in the conduct or operation of its Business are in good operating condition and repair (reasonable wear and tear excepted), are suitable for the purposes for which they are used and are all of the material properties and assets necessary for the conduct and operation of the Business of the Seller as currently conducted. The Seller is the sole owner of all material properties and assets, including trademarks, used by the Seller in the conduct or operation of the Business of the Seller, except for properties and assets leased or licensed to the Seller pursuant to Contracts listed in Section 4.8(a) of the Seller Disclosure Schedule, to which the Seller has a valid lease or license.

4.12    Compliance with Law; Permits; Customs.

(a)    Except as set forth in Section 4.12(a) of the Seller Disclosure Schedule, during the five (5) years immediately preceding the date hereof, the Seller is and has been in compliance in all material respects with all applicable Laws governing the conduct or operation

KL2:2428358.11

relationship of the Business with such a customer or group of customers. The Seller generally has a satisfactory relationship with each of its ten (10) largest customers.

4.21    Absence of Certain Business Practices.

(a)    Neither the Seller, nor any of the Seller's directors or officers, nor, to the Knowledge of the Seller, any of the Seller's employees or agents, have directly or indirectly (a) made any contribution or gift which contribution or gift is in violation of any applicable Law, (b) made any bribe, rebate, payoff, influence payment, kickback or other payment to any Person, regardless of form, whether in money, property or services, in violation of any Law or legal requirement, or (c) established or maintained any fund or asset of the Seller that has not been recorded in the books and records of the Seller.

(b)    To the Knowledge of the Seller, the Seller's manufacturing subcontractors have manufactured Seller Products in accordance with all applicable manufacturing/labor laws and regulations, all applicable manufacturing/labor conditions, standards and requirements (including without limitation as to age, working conditions, hours worked and maternity leave) of the retailers carrying such products and in compliance with the policies and standard manufacturing agreement of the Seller as in effect from time to time.

4.22    Brokers and Finders. Except for Fort Dearborn Advisors, LLC, no broker, finder or investment advisor has been engaged by the Seller in connection with the transactions contemplated by this Agreement.

4.23    Restrictions on Business Activities. There is no judgment, injunction, order or decree from a Governmental Body binding upon the Seller or, to the Knowledge of the Seller, threatened, that has or could reasonably be expected to have the effect of prohibiting or impairing the conduct of the business by the Seller as currently conducted.

4.24    Payables. Except as set forth in Section 4.24 of the Seller Disclosure Schedule, all accounts payable of the Seller have arisen in the ordinary course of business. All items which are required by GAAP to be reflected as payables on the Financial Statements and on the books and records of the Seller are so reflected and have been recorded in accordance with GAAP and in a commercially reasonable manner. There has been no material adverse change since December 31, 2005 in the amount or delinquency of accounts payable of the Seller, either individually or in the aggregate.

4.25    Receivables. All Accounts Receivable of the Seller have arisen in the ordinary course of business, represent valid obligations to the Seller arising from bona fide transactions, and, to the Knowledge of the Seller, are not subject to claims, set-off, other defenses or counterclaims or any other facts or circumstances adversely affecting the collectibility thereof. All items which are required by GAAP to be reflected as receivables on the Financial Statements and on the Books and Records of the Seller are so reflected and have been recorded in accordance with GAAP and in a commercially reasonable manner.

4.26    Business Relations. Other than as set forth in Section 4.26 of the Seller Disclosure Schedule, (i) the Seller is not required to provide any bonding or any other financial security arrangements in connection with any transaction with any customer or supplier, (ii)

**Schedule A**

| | Balance | Sub Schedule |
|---|---|---|
| AP | 19,201.65 | 1A |
| Sammart | 7,124.20 | 1B |
| Duties Payable | 56,528.00 | 2 |
| Payroll - Vacation | 145,000.00 | 3 |
| Sales Comm | 821.35 | 4 |
| Payroll Tax | 23,000.00 | 5 |
| Interest | 4,312.74 | 6 |
| Prof Fees | 23,500.00 | 7 |
| Royalty | 531,423.84 | 8 |
| Other accrued | 144,880.00 | 9 |
| | 955,791.78 | |
| Accrued Inventory | 863,532.00 | 10 |
| Total | 1,819,323.78 | |

Sub Schedule 1B

Detailed Aged Accounts Payable -Sammart
As of March 31, 2006

| Sammart Fashion Co Ltd | Ttl Debit Memos | Ttl Credit Memos | Open Invoices |
|---|---|---|---|
| CTV 5993 | | (160,165.70) | |
| CTV5980 | | (48,040.76) | |
| CTV5986 | | (15,062.91) | |
| CTV5960 | | (4,491.74) | |
| CTV5982 | | (4,355.25) | |
| CTV5965 | | (4,063.44) | |
| CTV5967 | | (3,802.32) | |
| CTV5966 | | (2,782.80) | |
| CTV5984 | | (2,342.06) | |
| CN200510005 | | (1,531.76) | |
| CTV5992 | | (1,429.00) | |
| CTV5979 | | (1,071.45) | |
| CTV5978 | | (586.00) | |
| CTV5968 | | (553.20) | |
| CTV5996 | | (480.75) | |
| CTV5976 | | (350.00) | |
| CTV5958 | | (343.67) | |
| CTV5999 | | (300.00) | |
| CTV5977 | | (85.44) | |
| DN200510008 | | (83.05) | |
| CTV5987 | | (55.20) | |
| CTV5981 | | (48.00) | |
| DN200510161 | 3.60 | | |
| DN200510083 | 8.98 | | |
| DN200510122 | 9.60 | | |
| DN200510047 | 10.05 | | |
| DN200510003 | 10.38 | | |
| DN200510046 | 11.91 | | |
| DN200412174 | 12.87 | | |
| DN200412172 | 12.87 | | |
| DN200509075 | 14.40 | | |
| DN200510120 | 15.66 | | |
| DN200512088 | 15.91 | | |
| DN200511011 | 16.20 | | |
| DN200511018 | 18.50 | | |
| DN200510041 | 19.50 | | |
| DN200512003 | 20.00 | | |
| DN200510013 | 20.50 | | |
| DN200509081 | 23.25 | | |
| DN200511006 | 24.00 | | |
| DN200509044 | 24.49 | | |
| DN200510123 | 25.50 | | |
| DN200512157 | 26.91 | | |
| DN200510018 | 27.30 | | |
| DN200510004 | 28.44 | | |
| DN200512122 | 29.19 | | |
| DN200509025 | 30.47 | | |
| DN200509055 | 31.92 | | |
| DN200601043 | 31.95 | | |
| DN200509058 | 32.51 | | |
| DN200509067 | 32.52 | | |
| DN200509035 | 32.74 | | |
| DN200510045 | 33.12 | | |
| DN200511066 | 33.30 | | |
| DN200511067 | 34.68 | | |
| DN200509065 | 35.40 | | |
| DN200509052 | 36.60 | | |
| DN200508058 | 36.88 | | |
| DN200511007 | 37.00 | | |
| DN200503024 | 37.29 | | |
| DN200509054 | 39.00 | | |
| DN200601045 | 39.15 | | |
| DN200602014 | 39.15 | | |
| DN200509056 | 39.48 | | |
| DN200509043 | 40.13 | | |
| DN200509062 | 41.25 | | |
| DN200510140 | 41.98 | | |
| DN200511008 | 42.00 | | |
| DN200511029 | 42.30 | | |
| DN200510121 | 43.19 | | |
| DN200510085 | 43.31 | | |
| DN200511014 | 43.35 | | |
| DN200510116 | 43.95 | | |

| Sammart Fashion Co Ltd | TU Debit Memos | TU Credit Memos | Open invoices |
|---|---|---|---|
| DN200508085 | 44.31 | | |
| DN200510017 | 44.45 | | |
| DN200510118 | 44.49 | | |
| DN200508067 | 44.52 | | |
| DN200511004 | 44.84 | | |
| DN200511028 | 45.42 | | |
| DN200510078 | 45.50 | | |
| DN200512013 | 46.70 | | |
| DN200510153 | 48.30 | | |
| DN200509046 | 48.60 | | |
| DN200512124 | 48.90 | | |
| DN200412204 | 49.08 | | |
| DN200510064 | 49.40 | | |
| DN200511031 | 49.86 | | |
| DN200510012 | 50.60 | | |
| DN200508062 | 50.85 | | |
| DN200508088 | 51.53 | | |
| DN200510042 | 52.17 | | |
| DN200509071 | 52.20 | | |
| DN200511090 | 52.35 | | |
| DN200510080 | 53.30 | | |
| DN200510005 | 54.45 | | |
| DN200509045 | 55.22 | | |
| DN200509063 | 56.30 | | |
| DN200512142 | 57.78 | | |
| DN200510014 | 58.25 | | |
| DN200511094 | 58.30 | | |
| DN200602015 | 59.25 | | |
| DN200510130 | 59.90 | | |
| DN200510157 | 60.00 | | |
| DN200512129 | 60.40 | | |
| DN200511010 | 61.20 | | |
| DN200511003 | 61.80 | | |
| DN200511030 | 64.02 | | |
| DN200510127 | 64.05 | | |
| DN200511086 | 64.50 | | |
| DN200511087 | 64.50 | | |
| DN200509064 | 64.80 | | |
| DN200512119 | 64.80 | | |
| DN200508015 | 64.94 | | |
| DN200510183 | 67.05 | | |
| DN200510081 | 67.95 | | |
| DN200512152 | 68.34 | | |
| DN200510015 | 69.00 | | |
| DN200512007 | 69.30 | | |
| DN200510039 | 69.50 | | |
| DN200512158 | 72.00 | | |
| DN200512120 | 72.00 | | |
| DN200509046 | 72.78 | | |
| DN200508012 | 74.81 | | |
| DN200512127 | 75.00 | | |
| DN200511012 | 75.20 | | |
| DN200601039 | 77.02 | | |
| DN200509026 | 77.70 | | |
| DN200510019 | 77.85 | | |
| DN200510049 | 78.30 | | |
| DN200509057 | 81.00 | | |
| DN200510154 | 82.19 | | |
| DN200510006 | 83.05 | | |
| DN200510066 | 83.05 | | |
| DN200511017 | 83.40 | | |
| DN200510044 | 84.15 | | |
| DN200512137 | 85.40 | | |
| DN200509053 | 85.44 | | |
| DN200510043 | 85.95 | | |
| DN200601029 | 86.82 | | |
| DN200512009 | 87.03 | | |
| DN200511013 | 87.40 | | |
| DN200510022 | 88.12 | | |
| DN200510119 | 89.04 | | |
| DN200512154 | 89.40 | | |
| DN200511019 | 90.30 | | |
| DN200511018 | 90.66 | | |
| DN200508002 | 90.80 | | |
| DN200510072 | 93.80 | | |
| DN200510021 | 94.85 | | |
| DN200510128 | 94.95 | | |
| DN200510193 | 95.70 | | |
| DN200512087 | 96.23 | | |

| Sanmart Fashion Co Ltd | Td Debit Memos | Td Credit Memos | Open Invoices |
|---|---|---|---|
| DN200601028 | 97.20 | | |
| DN200511034 | 98.40 | | |
| DN200512121 | 99.45 | | |
| DN200510053 | 101.10 | | |
| DN200510117 | 101.25 | | |
| DN200510138 | 102.72 | | |
| DN200512136 | 104.20 | | |
| DN200510129 | 104.40 | | |
| DN200510060 | 105.37 | | |
| DN200512140 | 105.93 | | |
| DN200510057 | 114.83 | | |
| DN200510033 | 114.83 | | |
| DN200510049 | 116.40 | | |
| DN200510050 | 117.06 | | |
| DN200512130 | 117.23 | | |
| DN200412207 | 120.70 | | |
| DN200601031 | 120.75 | | |
| DN200509080 | 124.02 | | |
| DN200511091 | 124.20 | | |
| DN200510071 | 125.16 | | |
| DN200511093 | 128.90 | | |
| DN200510040 | 129.30 | | |
| DN200508014 | 129.87 | | |
| DN200510055 | 131.10 | | |
| DN200510082 | 134.65 | | |
| DN200512134 | 136.65 | | |
| DN200512012 | 136.69 | | |
| DN200510194 | 138.26 | | |
| DN200509051 | 139.32 | | |
| DN200512141 | 142.77 | | |
| DN200512139 | 142.85 | | |
| DN200601034 | 146.01 | | |
| DN200511065 | 147.24 | | |
| DN200510002 | 147.40 | | |
| DN200511063 | 147.49 | | |
| DN200511036 | 148.50 | | |
| DN200511005 | 149.40 | | |
| DN200509023 | 150.39 | | |
| DN200509009 | 153.44 | | |
| DN200510051 | 155.38 | | |
| DN200508016 | 158.40 | | |
| DN200511068 | 162.42 | | |
| DN200510038 | 164.45 | | |
| DN200512153 | 164.55 | | |
| DN200510074 | 164.60 | | |
| DN200512126 | 165.20 | | |
| DN200510048 | 166.84 | | |
| DN200511026 | 169.50 | | |
| DN200510034 | 170.50 | | |
| DN200510106 | 170.76 | | |
| DN200508005 | 174.55 | | |
| DN200510126 | 176.20 | | |
| DN200601032 | 177.45 | | |
| DN200512005 | 180.35 | | |
| DN200509020 | 180.95 | | |
| DN200808063 | 181.35 | | |
| DN200512135 | 182.47 | | |
| DN200601027 | 186.00 | | |
| DN200510083 | 186.05 | | |
| DN200509022 | 188.00 | | |
| DN200510133 | 195.76 | | |
| DN200509066 | 203.81 | | |
| DN200510192 | 206.52 | | |
| DN200510176 | 209.28 | | |
| DN200510036 | 211.50 | | |
| DN200508084 | 215.28 | | |
| DN200512006 | 216.15 | | |
| DN200510159 | 218.00 | | |
| DN200510059 | 224.63 | | |
| DN200510112 | 226.04 | | |
| DN200510001 | 226.77 | | |
| DN200512123 | 228.75 | | |
| DN200601042 | 231.00 | | |
| DN200509072 | 232.72 | | |
| DN200511069 | 234.43 | | |
| DN200601037 | 234.45 | | |
| DN200508089 | 235.78 | | |
| DN200510068 | 240.60 | | |
| DN200510054 | 241.80 | | |

| Sammart Fashion Co Ltd | Ttl Debit Memos | Ttl Credit Memos | Open Invoices |
|---|---|---|---|
| DN200510058 | 244.47 | | |
| DN200510181 | 247.32 | | |
| DN200508090 | 248.70 | | |
| DN200512128 | 252.10 | | |
| DN200510061 | 263.28 | | |
| DN200508013 | 264.40 | | |
| DN200510113 | 270.22 | | |
| DN200510052 | 270.96 | | |
| DN200510067 | 272.62 | | |
| DN200512138 | 275.32 | | |
| DN200511009 | 275.90 | | |
| DN200508066 | 277.68 | | |
| DN200511032 | 279.30 | | |
| DN200512101 | 281.00 | | |
| DN200510184 | 282.30 | | |
| DN200510107 | 289.79 | | |
| DN200601033 | 295.14 | | |
| DN200510006 | 298.80 | | |
| DN200510037 | 303.30 | | |
| DN200510089 | 306.00 | | |
| DN200512004 | 312.25 | | |
| DN200512008 | 316.45 | | |
| DN200510191 | 329.10 | | |
| DN200510035 | 332.00 | | |
| DN200510077 | 332.35 | | |
| DN200511092 | 337.65 | | |
| DN200508011 | 340.00 | | |
| DN200510023 | 340.78 | | |
| DN200509074 | 341.00 | | |
| DN200510056 | 342.00 | | |
| DN200512155 | 345.89 | | |
| DN200510195 | 356.94 | | |
| DN200511035 | 364.00 | | |
| DN200511027 | 368.05 | | |
| DN200601044 | 370.98 | | |
| DN200511020 | 374.50 | | |
| DN200511033 | 382.00 | | |
| DN200509039 | 385.20 | | |
| DN200511089 | 387.40 | | |
| DN200508042 | 400.00 | | |
| DN200510134 | 410.05 | | |
| DN200601040 | 412.40 | | |
| DN200512125 | 418.05 | | |
| DN200510115 | 431.78 | | |
| DN200601036 | 446.96 | | |
| DN200510139 | 451.70 | | |
| DN200601035 | 452.77 | | |
| DN200510149 | 466.79 | | |
| DN200512133 | 471.24 | | |
| DN200512160 | 480.00 | | |
| DN200510076 | 480.77 | | |
| DN200511088 | 483.10 | | |
| DN200601038 | 495.80 | | |
| DN200512158 | 512.32 | | |
| DN200510007 | 527.22 | | |
| DN200510185 | 545.25 | | |
| DN200510136 | 550.35 | | |
| DN200510141 | 580.65 | | |
| DN200510073 | 583.96 | | |
| DN200510100 | 591.25 | | |
| DN200601041 | 598.62 | | |
| DN200510158 | 603.85 | | |
| DN200510114 | 614.12 | | |
| DN200510180 | 632.25 | | |
| DN200510084 | 639.68 | | |
| DN200510156 | 643.20 | | |
| DN200511064 | 649.49 | | |
| DN200512159 | 656.31 | | |
| DN200510137 | 673.40 | | |
| DN200510070 | 701.44 | | |
| DN200510160 | 704.90 | | |
| DN200510085 | 713.37 | | |
| DN200510135 | 719.40 | | |
| DN200601030 | 757.54 | | |
| DN200510182 | 812.50 | | |
| DN200510082 | 831.90 | | |
| DN200512002 | 883.69 | | |
| DN200507024 | 934.40 | | |
| DN200508056 | 975.71 | | |

| Sammart Fashion Co Ltd | Ttl Debit Memos | Ttl Credit Memos | Open Invoices |
|---|---|---|---|
| DN200508003 | 987.23 | | |
| DN200508054 | 1,324.26 | | |
| DN200508055 | 1,344.34 | | |
| DN200508039 | 1,722.60 | | |
| DN200511021 | 1,982.56 | | |
| DN200508004 | 2,015.49 | | |
| DN200410062 | 2,040.00 | | |
| DN200508007 | 2,413.10 | | |
| DN200511022 | 3,545.00 | | |
| DN200601087 | 4,035.00 | | |
| DN200508006 | 4,397.79 | | |
| DN200510088 | 8,245.00 | | |
| DN200508045 | 28,765.54 | | |
| DN200509047 | 28,925.00 | | |
| Grayson | | | 13,582.50 |
| DN200502048 | | | 2,635.00 |
| DN200502089 | | | 190.45 |
| DN200503168 | | | 12.85 |
| DN200504084 | | | 37.15 |
| DN200504201 | | | 18.80 |
| DN200504189 | | | 70.56 |
| DN200504188 | | | 51.19 |
| DN200506008 | | | 291.43 |
| DN200510075 | | | 593.74 |
| DN200510079 | | | 193.44 |
| DN200510094 | | | 2,707.30 |
| DN200510155 | | | 58.00 |
| DN200601092 | | | 2,458.93 |
| DN200512083 | | | 62,813.86 |
| DN200512084 | | | 19,530.69 |
| DN200603001 | $15.27 | | |
| DN200603002 | $378.05 | | |
| DN200603003 | $846.35 | | |
| DN200603004 | $144.52 | | |
| DN200603005 | $199.25 | | |
| DN200603006 | $554.10 | | |
| DN200603007 | $289.30 | | |
| DN200603008 | $585.01 | | |
| DN200603009 | $300.75 | | |
| DN200603014 | $365.85 | | |
| DN200603015 | $438.00 | | |
| DN200603016 | $347.97 | | |
| DN200603017 | $198.70 | | |
| DN200603025 | $15.27 | | |
| DN200603031 | $354.58 | | |
| DN200603032 | $329.25 | | |
| DN200603033 | $775.61 | | |
| DN200603034 | $519.30 | | |
| Matching up w/statement ttl as of 3/31/06 | 58.00 | | (203.58) |

| Total | 154,088.41 | (252,004.52) | 105,040.31 |
|---|---|---|---|
| | Acct# 1140 | Acct# 1140 | Acct# 2210 |

| Total Due less Sammart claim, net of credits | (97,916.11) |
|---|---|

| Total Due | 7,124.20 |
|---|---|

SECTION 4.8(b) OF SELLER'S DISCLOSURE SCHEDULE

Expiration

$220,506.37 due to Sammart for various merchandise and inventory (potential purchase order contractual breach).  This is separate from the Sammart, Ltd. credit balance of $126,893.20 referenced in Section 4.25 of Seller's Disclosure Schedule.

SECTION 4.25 OF SELLER'S DISCLOSURE SCHEDULE

Receivables

Accounts Receivable Deduction for Target Margin Support -- $175,000.00

Current reserve level:            $600,000

Additional Reserves for Year
End
Major Sales Allowances            $500,000
Off Invoice Terms                 $198,000
Target                            $175,000
Approved / Not taken              $258,000
Misc / Compliance                  $50,000

Total                             $1,181,000

As of 12/31/05, the Company has a credit balance of $126,893.20 in the accounts payable account of Sammart, Ltd. Accordingly, this credit balance has been characterized as an "other receivable" on the 12/31/05 Balance Sheet. As Sammart has a claim, also recorded on the Balance Sheet as an "other accrued liability," to be reimbursed for unused fabric and trim purchased on the Company's behalf in the amount of $122,000.00, the Company anticipates that the aforementioned receivable will be offset.

Index No. 07 CV 4035 (DAB)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SAMMART FASHION CO. LTD.,

Plaintiff,

- against -

WEAR ME APPAREL CORP. d/b/a KIDS
HEADQUARTERS and HEYMAN CORPORATION,

Defendants.

---

## REPLY DECLARATION OF BONNIE PODOLSKY

---

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
*Attorneys for Defendant Wear Me Apparel LLC d/b/a Kids
Headquarters*

1177 Avenue of the Americas  New York, New York  10036
(212) 715-9100

*All communications should be referred to:*
Jonathan M. Wagner
Jeremy A. Cohen

KL3 2619676.1